Art SWINDEL, d/b/a Prudhoe Bay Utilities, Inc., Appellant,

v.

Thomas E. KELLY, Commissioner of the Department of Natural Resources, and F. J. Keenan, Director of the Division of Lands, State of Alaska, Appellees.

NORTH SLOPE ENTERPRISES, INC., an Alaska Corporation, Appellants,

v.

Thomas E. KELLY, Commissioner of the Department of Natural Resources, and F. J. Keenan, Director of the Division of Lands, State of Alaska, Appellees.

Nos. 1416, 1418.

Supreme Court of Alaska.

July 10, 1972.

James H. Lack, Anchorage, for appellant Art Swindel.

Francis J. Nosek, Jr., and Bennett Williams, Anchorage, for North Slope Enterprises, Inc.

John E. Havelock, Atty. Gen., Juneau, John K. Norman, Asst. Atty. Gen., Anchorage, for appellees.

Before BONEY, C. J., and RABINOWITZ, CONNOR and ERWIN, JJ.

RABINOWITZ, Justice.

On June 19, 1969, Art Swindel, d/b/a Prudhoe Bay Utilities, Inc., and Miles

Dean, d/b/a Cook Inlet Welding and Contracting, Inc., submitted to F. J. Keenan, Director of the Division of Lands, Department of Natural Resources, State of Alaska, a joint application for a special land use permit pertaining to 10 acres situated north of the Brooks Range.[1] In their application Swindel and Dean listed their address as "Box 4–103 Anchorage 99503 or No. Star Route 1, Kenai 99611."[2] All subsequent correspondence between the Division of Lands and the applicants regarding the application for a special use permit was either directed to or initiated by Dean alone. On August 18, 1969, the Division of Lands issued a special land use permit to Swindel and Dean. The permit was for a period of five years but was made subject to the special condition that it could be cancelled upon 30 days written notice.[3]

North Slope Enterprises, Inc., [hereinafter North Slope] applied to the Division of Lands on September 8, 1969, for a 5-year surface lease encompassing 100 acres. This acreage included the 10 acres Swindel and Dean had been permitted to use under the special land use permit. Charles L. Ellington signed the application for the surface lease as president of North Slope. On October 13, 1969, Miles Dean informed the Division of Lands by letter that a group was in the process of incorporating as North Slope and needed a firm lease on the 100-acre parcel.[4] On October 23, 1969, the Division of Lands sent Lease Agreement ADL–47873 to North Slope. The lease covered the 100 acres originally applied for at an annual rental of $150. The lease designated "North Slope Enterprises, Inc. of Box 3–3967, Anchorage, Alaska" as the lessee. The lease agreement was accepted by Charles L. Ellington as lessee.

On October 29, the Division of Lands sent notice of cancellation of the special land use permit it had previously issued to Swindel and Dean. The cancellation was to take effect on November 29. The Division of Lands sent this notice of cancellation to Dean at the same address to which it had previously sent all other correspondence relating to the special land use permit. Dean apparently did not tell Swindel of the notice of cancellation.[5] On December 20, 1969, articles of incorporation for North Slope were executed and filed with the Commissioner of Commerce. Two days later the articles were approved and a certificate of incorporation to North Slope issued.

On December 26, 1969, the Division of Lands received a letter from Miles W. Dean, Vice-President of North Slope Enterprises, Inc., stating in part that "Charles L. Ellington is no longer associated with North Slope Enterprises, Inc."[6] At approximately the same time the Division of

---

1. Dean originally filed a separate appeal arising out of the same facts as these consolidated appeals. Dean did not perfect his appeal and it was subsequently dismissed.

2. The special land use permit which was issued showed the permittee's address as "1100 Gambel or P. O. Box 3–3967, Anchorage, Alaska." The stated proposed use of the acreage was for business use in that Swindel and Dean planned to erect a "large steel building for contract welding, dirt work and utilities."

3. The special land use permit covered 10 acres and provided for an annual rental of $40.

4. This letter from Dean reads in part as follows:

A group of five individuals namely; Mr. John Poche, Jr., Mr. Sam Sonnier, Mr. Miles Dean, Mr. Stanley Oslund, and Mr. Charles Ellington are in the process of incorporating a company named, North Slope Enterprises, Inc. for the purpose of building an industrial subdivision to service oil companies on the North Slope in the Dead Horse area. Dean used the same address for the North Slope correspondence as he did for that relating to his activities with Swindel.

5. In his complaint in the superior court, Swindel asserted that "as joint permittee" he did not receive notice of the cancellation and did not learn of the cancellation until January 27, 1970.

6. Ellington was not listed among the incorporators; in fact, of the group originally named as being in the process of incorporating, only Dean finally participated.

Lands also received a letter from Charles Ellington. Ellington's letter was a slightly altered copy of North Slope's October 13 letter, over his own signature, to the Division of Lands. The changes were to the effect that he was himself incorporating as North Slope. Ellington submitted virtually the same letter again on both January 9 and January 13. Thereafter the Division of Lands investigated the matter and determined that North Slope had not received its certificate of incorporation until December 22, 1969.

The Director of the Division of Lands mailed North Slope notice of cancellation of the surface lease to Dean's address on January 8. The notice stated the lease was cancelled pursuant to Section 302.26(b), Alaska Surface Leasing Regulations, Alaska Administrative Code, Title 11. The reason given for cancellation was that North Slope had not been a legal entity at the time of leasing and was therefore not capable of securing a lease under the regulations. North Slope and Ellington both appealed from the Director of the Division of Lands' decision.[7] Swindel, having finally learned of the cancellation of his permit on January 27, 1970, appealed that cancellation and intervened in the appeals from the surface lease cancellation. The Commissioner of the Department of Natural Resources affirmed the decision cancelling the surface lease, concurring with the Director's conclusion "that a corporation must be in existence before it is capable of acquiring a lease under the Alaska Leasing Regulations." Swindel and North Slope then severally appealed the Commissioner of Natural Resources' decision to the superior court.[8] In the superior court, Swindel, North Slope and Ellington filed separate motions for partial summary judgment with Kelly and Keenan filing a cross-motion for summary judgment. At this point, Ellington, Dean, Swindel and North Slope stipulated that the only questions before the superior court were the cancellations of the special land use permit and of the surface lease.[9] The superior court entered judgment affirming cancellation of the land lease.[10] Swindel and North Slope now appeal the superior court's summary judgment.

■ We turn first to the cancellation of the special land use permit. The Director of the Division of Lands is authorized to issue special land use permits "on such terms and conditions as he deems to be in the best interests of Alaska."[11] The form (DL–18) used by the Division of Lands as both application and permit spe-

---

7. The notice of appeal filed January 16 was signed by Charles Ellington as President of North Slope, by Charles Ellington, an individual d/b/a North Slope Enterprises, and by Miles Dean as Vice President of North Slope.

8. Swindel, in his appeal, requested that the superior court set aside ·the decisions of the Director of the Division of Lands and the Commissioner of the Department of Natural Resources, declare that the leased lands be held by North Slope as trustee of a resulting trust for Swindel's benefit, and declare invalid the cancellation of the lease.

9. All other questions between the parties were reserved until resolution of the cancellation issues.

10. As to the cancellation of the special land use permit, the superior court, in its decision, held in part:

Since . . . the general rule is that each member of a joint venture acts as both principal and agent of his coventurers within the scope of the venture, and coupled with the fact that the permit as well as the Notice of Cancellation thereof were both addressed to the same coventurer at the same place, the cancellation should be effective as to the state.

Concerning the cancellation of the land lease, the superior court, in its decision, stated in part:

The fact that NSEI was subsequently incorporated does not appear to have any bearing on the matter, since it is differently constituted than as represented on the application, there being no President ELLINGTON. Except for DEAN, the incorporators differ to the point of constituting an entirely different group.

11. 11 Alaska Adm.Code § 304.2 (1969).

cifically limits its grant of "[p]ermission . . . to occupy and use the lands herein described for the purposes stated *upon the following* conditions." (emphasis added) In addition to the standard conditions included in the form, there is also a space for insertion of special conditions. On the Swindel-Dean permit the Division of Lands typed "Subject to cancellation upon 30 days written notice." In the cover letter to the grant of the special land use permit, the Division of Lands explicitly brought this condition to the permittees' attention. Since there has been no claim or showing of irregularity or impropriety in imposition of the condition, we find that under Alaska Administrative Code, Title 11, Section 304.2, the Division of Lands was authorized both to impose the condition and to cancel pursuant to it.[12]

█ In this appeal Swindel argues that in order for the Division of Lands to cancel effectively the special land use permit, as the same pertained to him, the Division was required to give him "actual notice" of the intended cancellation. In this regard, Swindel asserts that a rule requir-

ing actual notice to all joint venturers "would more fully comport with modern business practice" and "traditional concepts of 'due process.'"[13] We affirm the superior court's decision that the Division of Land's notice cancelling special land use permit ADL–47076 was binding on Swindel. Given the facts that Swindel and Dean made a joint application for the special land use permit, listing their addresses alternatively in the application, that the special land use permit also listed their addresses alternatively, and that all correspondence preceding the issuance of the use permit up to and including the notice of cancellation had been either directed to or initiated by Dean alone, we hold that the Division of Land's notice of cancellation of the special land use permit was effective as against Swindel. In short, we conclude that notice to one coventurer binds the other coventurer.[14]

█ Swindel further argues that he and his joint venturer, Dean, by expending large sums in reliance on the special land use permit[15] converted their interests into property rights in the lands covered by the

12. The Division of Lands did not offer the permittees a reason for the cancellation, but none is required. Nothing in the condition itself or in the authorizing regulation restricts the cancellation power to certain situations. The legislature has provided some direction for such situations in AS 38.05.330, saying:

In the granting, suspension or revocation of a permit . . . the director shall give preference to that use of the land which will be of greatest economic benefit to the state and the development of its resources.

In the absence of any showing of disregard of these matters, we will not assume the Director of the Division of Lands acted improperly.

13. Swindel also advances the argument that:

Although the State had notice, by reason of DEAN's October 13, 1969, letter, that DEAN was acting contrary to the interests of his joint permittee, ART SWINDEL, nevertheless, the State, for reasons of its own, avoided giving SWINDEL actual notice of cancellation of the permit.

Kelly and Keenan, in their brief before us, counter in the following fashion:

In the interval between processing Special Land Use Permit application ADL-47076 and lease application ADL–47873, the Division of Lands was occupied with some 797 other serial numbered applications or entries on state land. Appellant Swindel had selected Miles Dean as his partner in this venture, and he was thus in a much better position than the state to keep abreast of the dealings of Messrs. Dean and Ellington.

We think Kelly's and Keenan's response is dispositive of this argument of Swindel.

14. *Compare* United States, for Use and Benefit of Hallenbeck v. Fleisher Eng'r & Constr. Co., 107 F.2d 925, 929 (2d Cir. 1939), aff'd, 311 U.S. 15, 61 S.Ct. 81, 85 L.Ed. 12 (1940), *with* Bronnenberg v. Indiana Union Traction Co., 59 Ind.App. 495, 109 N.E. 784, 786 (1915).

15. The permittees' on-site investment in reliance on the permit was manifested in a gravel pad, four vehicles including a camper and a camp trailer, two small wooden buildings, sundry oil drums and a stack of drill pipe.

special land use permit. More specifically Swindel contends that

> a license coupled with an interest is not revocable by the conveyance to which it relates, and a license may become an agreement for a valuable consideration, as where the enjoyment of it must necessarily be preceded by the expenditure of money; and when the licensee has made improvements or invested capital in consequence of a license, he has become a purchaser for a valuable consideration.

Kelly and Keenan assert that Swindel's argument has no application in the case of a permit agreement of fixed duration expressly conditioned to be revocable upon notice. They note that courts have distinguished between a bare license and a license created by an actual agreement between the parties. After initially discussing the rule that a license can rise to the dignity of an agreement and clothe the licensee with the rights and privileges of a purchaser for a valuable consideration, the court, in Earth Products Company v. Oklahoma City, 441 P.2d 399, 403 (Okl.1968), said:

> Applying the established principle that the rights and privileges of a licensee are dependent upon the agreement creating the license, we must resort to the written contract in this case to ascertain them.[16]

We think the rule of law espoused in the *Earth Products* decision is sound and is apposite here. It would lead to an unjust result if the State of Alaska, as owner of the 10 acres in question, were to lose its title to these lands simply by issuing a special land use permit for a limited period. Moreover, it would be inconsistent with the theory of consideration [17] to treat as a benefit accruing to the owner of land, and hence valuable consideration, that which the owner allowed someone else to use the land for, especially when the fee for the use of the land is nominal.

The rules relating to a license coupled with an interest are also inapplicable. The *Restatement of Property* defines a license coupled with an interest as "one which is incidental to the ownership of an interest in a chattel personal located on the land with respect to which the license exists." [18] The license in such situations arises because of a prior chattel interest and is usually limited in duration to the period necessary to enjoyment of that interest. In contrast, the chattels in the case at bar were brought to the land only after the land's use had been authorized. To treat subsequently introduced chattels as turning the licensee's interest into an irrevocable one under this doctrine would be an exercise in circular reasoning.

■ This leads us to the conclusion that the terms of the special land use permit are determinative of the relationship between Swindel and Dean and the State of Alaska. In the case at bar no ambiguity or deceit was manifest in the Division of Land's issuance of the special land use permit since the intent to make the permit cancellable at will was expressly stated. In these circumstances we hold that the state properly exercised the right of can-

16. Nevertheless, there is some authority for an equitable determination that a license may not be revoked once the licensee has made considerable expenditures in reliance on the license. *See* 3 H. Tiffany, Real Property § 834 (3d ed. 1939). The principle, however implemented, evolved to afford licensees equitable protection against deceit or fraud on the part of licensors; consequently it was most often applied to parol licenses. Metcalf v. Hart, 3 Wyo. 513, 27 P. 900, 914 (1891). In any event, the applicability of this exception to revocability would be measured by the terms and true intent of the agreed upon license. *Id.* at 915.

17. The usual test for valuable or sufficient consideration is whether the promise involved a detriment incurred by the promise or a benefit accruing to the promissor at his request. 1 A. Corbin, Contracts §§ 121–122 (1963); 1 S. Williston, Contracts § 102 (3d ed. Jaeger 1957). *See also* Restatement of Contracts §§ 75–76 (1932).

18. Restatement of Property § 513, Comments (1944); 3 H. Tiffany, Real Property § 835 (3d ed. 1939).

cellation which was made an express condition of the special land use permit which had been issued to Swindel and Dean.[19]

We next turn to the question of whether the Director of the Division of Lands properly terminated the surface lease that had been issued to North Slope. On January 8, 1970, the Director of the Division of Lands sent notice to North Slope that its surface lease was "null and void and [was] cancelled as having been issued in error," pursuant to Alaska Administrative Code, Title 11, Section 302.26(b). The reason given was that the applicant "was not a legal entity at the time the lease agreement was consummated, and therefore was not capable of securing or holding a lease under the Division of Lands, Surface Leasing Regulations." [20]

■ In this appeal from the superior court's affirmance of that cancellation, North Slope argues that the state has power to cancel a surface lease from its inception only "where there are competing applicants, fraud or the potential of fraud, and prejudice to both competing applicants and to the public." We find that this limitation is not in any way inherent or implicit in the regulation that the Director relied on for the authority to cancel North Slope's surface lease.

■ The relevant section of the Alaska Administrative Code provides:

A lease is subject to cancellation in whole or in part if improperly issued

through misrepresentation or error with respect to material facts.[21]

The regulation allows the Director flexibility in which to decide whether to cancel at all and leaves open the question of what the appropriate effective date for a given cancellation should be. Since the regulation does not automatically invalidate the surface lease in question, we must decide whether the Director's cancellation was, under the circumstances, properly within the scope of the regulations.

■ This court has established that leasing decisions of the Division of Lands and Department of Natural Resources are subject to judicial review. Moreover, we there held that such judicial review would be governed by the relevant provisions of the Administrative Procedure Act.[22] Alyeska Ski Corporation v. Holdsworth, 426 P. 2d 1006, 1012 (Alaska 1967).

In the instant case it is clear that at the time of the application for and issuance of the surface lease North Slope was not a corporate entity under the law. The dispute arises over whether this failing constituted "a misrepresentation or error with respect to [a] material [fact]." Implicit in the Commissioner's affirmance of the cancellation is the decision that nonexistence of a qualified applicant is a material fact whether the mistaken issuance is the result of the applicant's misrepresentation or error or of agency oversight.[23] The superior court, in its decision affirming the Commissioner's decision, stated in part, "In ex-

---

19. In regard to Swindel's allegations of improvements made in reliance upon the special land use permit, Kelly and Keenan state:

> If however, improvements have been made and there are equities involved, then appellant is not without a remedy. Appellant may be entitled to a preference right recognizable under AS 38.-05.035(b) (2) or (3); and he would be entitled to compensation in accordance with AS 38.05.090 for authorized improvements which have become fixtures to the land.

20. The leasing of state lands is governed by regulations promulgated by the Commissioner of the Department of Natural

Resources, pursuant to AS 38.05.020(b) (1), and executed by the Director of the Division of Lands, pursuant to AS 38.-05.035(a) (3).

21. Title 11, § 302.26(b) (1969).

22. AS 44.62.560 and AS 44.62.570.

23. At no step in these proceedings has any decision assessed blame on one party or the other, although North Slope has suggested that it gave the agency adequate notice that it was only in the process of incorporating. Since the issue has not been squarely presented, we will assume without deciding, for purposes of these appeals, that the question of fault is irrelevant.

amining the regulation, it is apparent that its purpose is to secure a juristic entity in the event there is a violation of public rights in the publicly-owned State land."

In recent decisions, we have differentiated two types of questions which may confront a court [24] in judicial review of administrative actions. We have long recognized the reviewing court's power to measure the decision by the test of whether "substantial evidence on the whole record" supports it. Pan American Petroleum Corporation v. Shell Oil Company, 455 P.2d 12, 20–21 (Alaska 1969); Keiner v. City of Anchorage, 378 P.2d 406, 411 (Alaska 1963). But we have also held that in certain areas of agency expertise the appropriate standard on review is whether the agency action had a reasonable basis. Kelly v. Zamarello, 486 P.2d 906, 911 (Alaska 1971); Pan American Petroleum Corporation v. Shell Oil Company, 455 P.2d at 21–22. The distinction was explicated in Kelly:

> One type [of administrative decision on questions of law] involves questions in which the particularized experience and knowledge of the administrative personnel goes into the determination. When this type of question is presented to the court for review, deference should be given to the administrative interpretation, since the expertise of the agency would be of material assistance to the court. . . . .
>
> The other kind of case presents questions of law in which knowledge and experience in the industry affords little guidance toward a proper consideration of the legal issues. These cases usually concern statutory interpretation or other analysis of legal relationships about

which courts have specialized knowledge and experience. Consequently, courts are at least as capable of deciding this kind of question as an administrative agency.

. . . . . .

> Application of the reasonable basis test is extremely useful where the administrative action under review resembles executive as opposed to legislative or judicial activity. . . . [Where the decision] under review clearly [has] nothing to do with the agency's rule-making function. . . .
>
> . . . We believe that the reasonable basis approach should be used for the most part in cases concerning administrative expertise as to either complex subject matter or fundamental policy formulations. 486 P.2d at 916–17.

Although *Pan American* involved more technical evidence,[25] it, like *Kelly*,[26] raised questions of basic policy formulation. Recognizing this, we applied the reasonable basis test in both cases and affirmed the agency decisions. The decision now before us is not one involving "administrative expertise as to [a] complex subject matter," but, like that in *Kelly*, it does involve fundamental policy formulations. The criteria for qualified applicants established by the Commissioner were undoubtedly designed to ensure to the extent possible that the state's lands will be entrusted only to responsible lessees. The Commissioner also might have been trying to guarantee that lessees would be legal entities who could be held accountable for breach, waste or other misuses of the state's assets.[27] The Commissioner could have determined that cancellation of this surface lease issued to an ineligible party would act to deter others

24. The initial review jurisdiction is vested in the superior court, and that decision may be appealed to this court. AS 44.62.560(a), AS 44.62.570(h).

25. *Pan American* involved questions of oil discovery evaluation and prediction of future well productivity.

26. In *Kelly*, the Commissioner had found some of the bids for certain oil and gas

leases "nonresponsive" because they contained conditions and interlineations in the bid form.

27. Although surface leasing may not bring as much revenue to the state as mineral leases, our state constitution expressly acknowledges as state policy the general value of all lands. Alaska Const. art. VIII, §§ 1, 2.

from submitting applications before qualified to do so. In any event, we find that there were reasonable bases for treating absence of a qualified [28] applicant as a material fact sufficient to justify cancellation of the lease from its inception.[29]

North Slope asserts that the cancellation of this lease is inconsistent with the Division's earlier decision not to cancel an oil and gas lease in the Tipperary case.[30] First it should be noted that the Tipperary lease was issued under an entirely different set of regulations than in the instant case, including a different set of qualifications for lessees.[31] In addition, the Tipperary facts are distinguishable from those in the instant case, most notably because Tipperary itself brought the defect to the Director's attention and corrected it prior to the issuance of the lease.[32] Even if this did indicate some inconsistency in the Di-

vision's treatment of surface leases as against oil and gas leases, we cannot say it is impermissible to treat two distinct leasing processes somewhat differently.

 North Slope's argument is that even if the Director had the power to cancel the lease from its inception, he was required by section 302.26 to give the lessee notice of the default and 30 days in which to cure it.[33] We find this to be an erroneous construction of the regulation. Section 302.26 covers four different situations which may bring about cancellation or forfeiture. Each is couched as a separate sentence with no indication that any was to be dependent on any other. Rather it appears clear that section 302.26(b) was intended to apply to defects occurring prior to or contemporaneous with the issuance of a lease while section 302.26(d) applies only

---

28. North Slope claims that it was a de facto corporation at the time of its application and therefore was not unqualified. The concept of de facto corporations has been increasingly disfavored, and Alaska is among the states whose corporation statutes are designed to eliminate the concept. See 8 W. Fletcher, Cyclopedia Corporations § 3762.1 (rev. ed. Wolf 1966); ABA–ALI Model Bus. Corp. Act, Annot. 2d § 56; AS 10.05.261. Moreover, at the time of application North Slope had not even satisfied the traditional prerequisites of de facto status: A corporation defectively created despite a bona fide effort to comply with incorporation statutes, coupled with an exercise of corporate powers. 8 W. Fletcher, Cyclopedia Corporations § 3761 (rev. ed. Wolf 1966). We therefore reject North Slope's contention.

29. The effective date of a cancellation due to ineligibility of the applicant would seem logically to be from the lease's inception. Absent any argument on the question or showing of harm flowing from such a ruling we cannot say that it was in error.

30. Alaska Dept. of Natural Resources, Division of Lands, Oil and Gas ADL No. 47560.

31. 11 Alaska Adm.Code, ch. 5, Mineral Leasing, §§ 501–516.9. The qualifications for a lessee are set out in Title 11, § 503.

32. Tipperary was a foreign corporation engaged in oil operations in other states.

At the last minute it decided to enter a bid for a North Slope oil lease, not realizing it did not meet the requirement of being qualified to do business in Alaska. It discovered and corrected the defect after its bid had been accepted. The agency determined that while a bidder should be qualified at the time it submits a bid, Tipperary's omission was a curable defect if it was an immaterial omission or due to excusable inadvertence *and* was corrected before *actual issuance* of the lease.

33. 11 Alaska Adm.Code, § 302.26 provides: Cancellation—Forfeiture.
 (a) Leases in good standing may be cancelled in whole or in part, at any time . . . .
 (b) A lease is subject to cancellation in whole or in part if improperly issued through misrepresentation or error with respect to material facts.
 (c) A lease may be cancelled if used for any unlawful purpose.
 (d) If the lessee shall default in the performance or observance of any of the lease terms, covenants or stipulations thereto or of the regulations now or hereafter in force or any of the provisions of the Land Act, and such default shall continue 30 calendar days after service of written notice thereof by the lessor, the Director shall subject the lessee to appropriate legal action, including, but not limited to, forfeiture of the lease. No improvements may be removed during any time the lessee is in default.

to breaches or defaults occurring after issuance.[34]

The superior court's judgment upholding the Commissioner of the Department of Natural Resources' affirmance of the Director of the Division of Lands' cancellation of the special land use permit and the surface lease is affirmed.

BOOCHEVER, J., not participating.

34. We similarly conclude that Swindel's further argument to the effect that paragraph 16 of the lease agreement required 30 days notice is without merit. This paragraph of the lease agreement is inapplicable as it applies to defaults in the performance of any of the terms, covenants, or stipulations contained in the lease.