**ALASKA PUBLIC UTILITIES COMMIS-
SION, an agency of the State of
Alaska, Petitioner,**

v.

**GREATER ANCHORAGE AREA BOR-
OUGH, an Alaska Municipal
Corporation, Respondent.**

No. 2314.

Supreme Court of Alaska.

April 4, 1975.

Peter C. Partnow, Asst. Atty. Gen., Anchorage Norman C. Gorsuch, Atty. Gen., Juneau, for petitioner.

David Shimek, Anchorage, for respondent.

Before RABINOWITZ, Chief Justice, and CONNOR, ERWIN, BOOCHEVER and FITZGERALD, Justices.

## OPINION

BOOCHEVER, Justice.

This petition for review requires us to re-examine criteria to be applied by the superior court in ascertaining whether to overrule a decision of the Alaska Public Utility Commission (hereinafter the Commission) pertaining to interim relief sought by a public utility which had applied for authority to charge higher rates.

The Greater Anchorage Area Borough (hereinafter the Borough) assumed responsibility for the City of Anchorage sewer utility operation in 1970 after having received appropriate authorization from the

voters of the Borough. The Borough points to three factors which have led to drastic increases in operating costs in recent years. First, the earthquake of 1964 caused extensive damage to the sewer system in Anchorage. This greatly accelerated the rate of deterioration of the system and has required constant attention involving repair and replacement of damaged lines ever since. Secondly, the passage of federal and state environmental legislation necessitated the construction of a sewage treatment plant at Point Woronzof. The construction of the facility was financed by the issuance of municipal revenue bonds. The substantial annual payments on these bonds along with the salaries of the 25 employees required to operate the plant constitute an additional drain on the resources available to the utility. Finally, the inflation of the past several years has greatly increased the cost of both labor and equipment.

On March 15, 1974, the Borough sewer utility sought a 17 percent increase in the basic user rate from $3.75 per month to $4.40 per month.[1] On April 15, 1974, the Commission ordered that the proposed tariff increase become conditionally effective, pending hearings and a final decision by the Commission. The Borough was to place these funds in escrow and keep accurate records so that, in the event the increase was eventually denied, the utility's customers could receive refunds. This form of interim relief was granted pursuant to the Commission's discretionary authority set forth in AS 42.05.421(c).[2]

Subsequently, the utility concluded that its original request was still inadequate to meet operating expenses, and on July 2, 1974, the Borough filed a supplemental request for a tariff increase from the former $3.75 per month and from the previously proposed $4.40 (effective during the interim) to $7.65 per month. It also requested that this new rate become effective during the interim subject to the same conditions as the former proposed increased for the protection of the utility's consumers. On July 30, 1974, the Commission denied this second request for an interim rate increase. The Commission, however, did realize the importance of an expeditious determination of the permanent rate, and it established a schedule for prefiled testimony shortly after denying the Borough petition.

The Commission, with one commissioner dissenting, found that it would be contrary to the public interest to grant such a substantial rate increase without the benefit of a full record or a public hearing. According to the Commission, the first interim rate increase would have allowed the collection of only $291,146 a year without benefit of hearing, whereas the second increase would have authorized the collection of $1,670,030 a year without such a hear-

1. In addition, the utility asked for a flexible rate structure. It requested that the Commission grant the authority to the Borough Assembly to increase the rate by ordinance up to that amount which could be shown to be appropriate. The Commission was called upon to set an upper limit on this authority by making a finding using traditional rate base analysis of a reasonable maximum user rate beyond which the Assembly could not authorize rate increases. In effect, this would have allowed the municipal utility to bypass the Commission's tariff filing procedures over the short term and would have allowed rates to increase at the same pace as costs. The Commission refused to consider this latter scheme.

2. AS 42.05.421(c):
   In the case of a proposed increased rate, the commission may by order require the interested public utility or utilities to place in escrow in a financial institution approved by the commission and keep accurate account of all amounts received by reason of the increase, specifying by whom and in whose behalf the amounts are paid. Upon completion of the hearing and decision the commission may by order require the public utility to refund to the persons in whose behalf the amounts were paid, that portion of the increased rates which was found to be unreasonable or unlawful. No funds shall be released from escrow without the commission's prior written consent and the escrow agent shall be so instructed by the utility, in writing, with a copy to the commission. The utility may, at its expense, substitute a bond in lieu of the escrow requirement.

ing. The request for interim relief was denied even though evidence (financial statements, schedules, etc.) was presented by the Borough which showed without question that the utility was operating at a huge loss.

This evidence was uncontradicted, and it showed that for the fiscal year 1972–73 the utility operated at a loss of $580,000. The fiscal year 1973–74 showed a total cash deficit of $2,400,000 even after a transfer of $1,000,000 of the general Borough property tax revenue to the utility.[3] Finally, it was shown that the proposed $7.65 user rate, should it be approved, would forestall the need for further emergency infusions of cash, although it would leave the utility's financial structure still dependent on some $1,600,000 from the general property tax levy of the Borough.[4]

On August 21, 1974, three weeks after the Commission refused to invoke its discretionary authority under the said statute and grant the interim rate hike, the Borough sought a preliminary injunction from the superior court to enjoin that part of the Commission's order which prevented it from imposing the increased rate during the period prior to the final hearings. The Borough pointed to its acute cash flow problem and to the fact that, should the $7.65 rate eventually be found by the Com-

mission to be reasonable and fair, its losses during the interim period would be irreparable since the Alaska regulatory scheme does not provide a statutory means of recoupment. While the Borough was faced with irreparable losses if injunctive relief were denied, the public, on the other hand, could be adequately safeguarded. The funds attributable to the proposed increase would be held in escrow and returned to the consumer should the Borough fail to prevail at the final hearing. The superior court issued such an injunction on August 26, 1974. This allowed the proposed $7.65 per month rate to go into effect.

Three days later the Commission moved for reconsideration, and the motion was heard on September 4, 1974. On September 5, 1974, the superior court denied the Commission's request for reconsideration and left its injunction in force.[5]

■ The Commission filed this petition for review on September 16, 1974. The opposition brief was filed by the Borough on September 24, 1974. On September 26, 1974, the Commission filed an application to stay the effect of the preliminary injunction pursuant to Alaska R.App.P. 7(d)(2)[6] pending determination of this issue presented for review by this court in the aforementioned petition. We denied the application believing that the expedi-

---

3. Exhibit V to July 2 filing and Exhibit F to July 11, 1974 filing. These figures do not include any allowance for depreciation which is estimated to run at about $1,400,000 a year.

4. Exhibit G to July 11, 1974 tariff filing.

5. The date of the final hearing had not as yet been fixed when the petition for review was filed despite the Commission's admission of the urgent need for resolving this controversy and setting a permanent rate only after benefit of a full public hearing. However, AS 42.05.421(a) imposes a six-month limitation on the authority of the Commission to suspend a new tariff filing.
AS 42.05.421(a) specifies:
  (a) When a tariff filing is made containing a new or revised rate, classification, rule, regulation, practice, or condition of service the commission may, either upon written complaint or upon its own motion,

after reasonable notice, conduct a hearing to determine the reasonableness and propriety of the filing. Pending such a hearing the commission may, by order stating the reasons for its action, suspend the operation of the tariff filing for an initial period not longer than six months beyond the time when it would otherwise go into effect.

6. Alaska R.App.P. 7(d)(2) provides:
  The supreme court or a justice thereof may stay the enforcement or effect of the judgment appealed from or the proceedings in the court below upon such terms as to bond or otherwise as may be proper. Application for a stay to this court or a justice thereof normally will not be entertained unless application has first been made to the court below and has been denied, or unless the security offered below has been disapproved.

tion with which the petition for review would be handled would render a stay unnecessary and the issues raised therein moot.[7]

█ In keeping with our desire to expedite disposition of this matter, we entered an order on November 7, 1974 granting the petition for review [8] and affirming the order of the superior court awarding interim relief to the utility. This opinion has been written because of the need to further elucidate the principles enunciated in A. J. Industries, Inc. v. Alaska Public Service Commission [9] and to give guidance for future cases as to the applicable considerations in reviewing a failure of the Commission to grant interim rate relief.

█ In general, a court in applying its equitable sanctions, must be most careful to avoid any semblance of judicial rate-making. Furthermore, the propriety

of issuing an injunction turns, in part, on weighing the demands of justice in the individual case against the interest in avoiding undue interference with the administrative process. In cases such as the present one where an interim rate increase is being sought by a utility, there is the danger of a too frequent resort to the injunction by the superior courts which, in turn, might cause the administrative commission automatically to grant such increases (having been effectively deprived of any real discretion in the matter).[10]

The respondent, in arguing that the preliminary injunction was proper in this case, relies heavily on A. J. Industries, Inc. v. Alaska Public Service Commission.[11] That case involved a petition for review of a superior court judgment denying the petitioner's request for a preliminary injunction. There A. J. Industries alleged that the Commission made various errors in setting

---

7. Also, on September 26, 1974, the Commission filed a motion to strike the entire 26-page opposition brief filed by the Borough on the grounds that it failed to comply with the requirements of Alaska R.App.P. 24(c). That section provides in part:
> The petition shall not exceed 15 pages in length and shall include, or have annexed thereto, a copy of the order form which appeal is sought showing the date that it was signed or entered, and copies of any findings of fact, conclusions of law and opinion related thereto. Within 7 days after service of the petition, an adverse party may file an answer in opposition. No reply brief will be filed unless ordered by the court.

Although it is not expressly stated that the respondent's brief is subject to the same 15-page limitation as is the petition, the Commission contends that it would be grossly unfair to limit one party and allow his adversary the luxury of an unlimited response. This court's interpretation of the limiting language in Rule 24(c) finds that it implicitly applies to the opposition brief as well. The purpose of the rule is to encourage brevity and to promote the expeditious handling of such petitions. In addition to the obvious inequity to the petitioner resulting from any other reading, allowing the opposing party an unlimited answer would serve to defeat the professed policy behind the rule. We shall so construe the rule in the future and anticipate a clarifying amendment to be promulgated at an early opportunity. In

this case, we have waived any noncompliance since it would only tend to further delay the resolution of this dispute which was deserving of the court's immediate attention.

8. Review was properly sought under Alaska R.App.P. 23(a) and (e) which provide for review:
> (a) From interlocutory orders granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions.

> (e) Where postponement of review until normal appeal may be taken from a final judgment or where it will result in injustice because of impairment of a legal right, or because of unnecessary delay, expense, hardship or other related factors.

We also find that review should be granted under Alaska R.App.P. 24(a)(2) which provides for review:
> (2) where the sound policy behind the general rule of requiring appeals to be taken only from final judgments is outweighed by the claim of the individual case that justice demands a present and immediate review of a particular nonappealable order or decision;

9. 470 P.2d 537 (Alaska 1970).

10. See Mountain States T. & T. Co. v. Public Utilities Com'n, 176 Colo. 457, 491 P.2d 582, 586 (1972).

11. 470 P.2d 537 (Alaska 1970).

its new rate. The request for an injunction came after a full hearing resulting in a permanent rate order—a final order of the Commission. In concluding that evidence of error was sufficient to warrant the issuance of a preliminary injunction providing for an interim rate pending final adjudication, we discussed the test to be applied by the lower court in deciding upon requests for preliminary injunctions.

We adopted the "balance of hardships" approach to determine the propriety of preliminary injunctive relief in cases "where the party seeking the injunction stands to suffer irreparable harm and where, at the same time, the opposing party can be protected from injury."[12] The "balance of hardship" test was defined in the following quotation from Ohio Oil Co. v. Conway:[13]

> Where the questions presented by an application for an interlocutory injunction are grave, and the injury to the moving party will be certain and irreparable if the application be denied and the final decree be in his favor, while if the injunction be granted the injury to the opposing party, even if the final decree be in his favor, will be inconsiderable, or may be adequately indemnified by a bond, the injunction usually will be granted.

■ When such a case is presented, it is no longer necessary to demonstrate that there is a clear probability of success on the merits. If the other elements are present tipping the balance of hardships in favor of the plaintiff:

> . . . [I]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.[14]

■ In summary, the test announced in A. J. Industries, Inc. requires the coexistence of three factors in order to justify the issuance of a preliminary injunction:

1) The plaintiff must be faced with irreparable harm.

2) The opposing party must be adequately protected.

3) The plaintiff must raise "serious" and "substantial" questions going to the merits of the case; that is, the issues raised cannot be "frivolous or obviously without merit".[15]

In applying its test to the facts in A. J. Industries, Inc., the court found it to be well settled that a public utility cannot recoup its past losses (in the absence of statutory authorization). Moreover, if, upon a final adjudication, the existing rate is held to be unreasonably low, the losses during the interim would not be recoverable and, therefore, the harm suffered would be irreparable. On the other hand, the court found that the interests of the consumer could be adequately protected by the establishment of a trust fund (or the posting of a bond) into which those funds derived from the utility's proposed rate increase which exceeded the Commission's authorized rate would be deposited. In that case, A. J. Industries was a wholesale seller of power, and the court emphasized the importance of keeping accurate records tracing any rate increases attributable to the preliminary injunction through the retailers to the ultimate consumers. This would allow those who actually bore the cost to be refunded any monies held in the trust in the event the utility's claim was rejected.

The Borough contends that the holding in A. J. Industries, Inc. controls this case. For the reasons that the sewer utility is faced with substantial irreparable harm,

---

12. 470 P.2d at 540.

13. 279 U.S. 813, 815, 49 S.Ct. 256, 73 L.Ed. 972, 973 (1929).

14. 470 P.2d at 540 *quoting* Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2nd Cir. 1953) (footnote omitted).

15. *Id.* 470 P.2d at 541. It should be noted that a finding that the existing rate was confiscatory was not made a part of the balance of hardship test adopted in A. J. Industries, Inc.,

that the consumers can be adequately protected by the escrow account procedure, and that the Borough has raised serious and substantial claims relating to the merits of the case, the balance of hardships is tipped in their favor.

In its motion for reconsideration, the Commission made three arguments opposing the issuance of the preliminary injunction. The first contention cited the existence of a proposed Borough ordinance whereby the purchase of the sewer utility by the Borough would be paid for by municipal bonds rather than through revenues derived from rates paid by the users, thus greatly alleviating the financial problem of the utility. However, to remove the injunction on this basis alone would have put the entire risk of loss on the utility in the event the ordinance failed to pass and, therefore, the problem of irreparable injury to the Borough remained. Only the actual passage of that ordinance, rather than the mere possibility of its passage, would have been a proper ground for possible reconsideration. The second argument concerning the establishment of basic user rates which reflect an allocation between direct user benefits and benefits afforded the nonuser public generally as a result of high environmental standards seems to fly in the face of the statutory language of AS 42.05.381(b) which states that a municipal utility is entitled to a reasonable return on its investment. However desirable such an allocation might be in the abstract, it is clear that a private utility would have to finance environmental safeguards required by law out of revenues derived from rates charged its consumers, and it would seem that, in the absence of statutory authority, the Commission would be exceeding its powers in imposing a different standard on the municipal utility. In any event, the Commission in advocating this theory is at most presenting a difficult and doubtful legal issue that can only be resolved by a hearing on the merits.

■ The third argument that renters of apartments and trailer spaces would be discriminated against in that they would bear the hidden cost of the increase but would not be reimbursed from the escrow account, since their payments would be attributed to the landlords, is more troublesome and deserves closer analysis. If it is true that the accounting procedure provided would not be able to trace these payments back to those renters bearing the cost of the interim increase, then a large segment of the consuming public would not be adequately protected from substantial injury by the escrow account or by a bond. The renters, in fact, would be faced with irreparable loss whereas the landlords and property owners would obtain an unlawful windfall in the event of refund. Needless to say, this same problem existed in *A. J. Industries, Inc.* (although it was not discussed), and it exists in all cases where the escrow procedure provided in A.S. 42.05.-421(c) is invoked. Thus, the court's finding that the ultimate consumer is adequately protected [16] is being challenged here by the Commission.

Broadly speaking, there are three general types of residential leases or rental agreements which must be considered. The first type is the lease calling for the lump sum periodic payment in which the costs of utilities are included. Here the landlord absorbs any increases in utility charges for the duration of his lease. Since interim rate hikes operate to increase his costs and reduce his net profit, the landlord is entitled to any refunds eventually released from escrow. In the second type, the renter must pay for his own utilities, and the utility companies generally bill the individual renter thus entitling the renter and not the landlord to any refunds.[17] A third type of agreement is

16. *See also* cases cited in *A. J. Industries, Inc.* at n. 9.

17. In general, most apartment leases which state that rental payments do not include utilities actually mean that the rent does not include the cost of electricity and/or heat. The sewer utility charge is more apt to be contained in the lump sum figure even in this second type of agreement.

theoretically possible. This would, in effect, be a "cost plus" agreement wherein the renter agrees to pay a variable rent determined by adding a uniform monthly profit to the landlord's actual costs. Here the renter would reimburse the landlord for all utility charges. The landlord would be on record as the consumer, and he would then unjustly receive a refund. However, this form of lease is so rare in practice that it does not constitute the sort of substantial injury to the consuming public which might tip the balance of hardship against the Borough in our case.[18]

The real problem with protecting renters does not arise so much from the form of the rental agreement as from the mobility of the renters themselves. Old leases are constantly being terminated and new agreements being reached involving either the same tenant at a higher rent [19] or a new tenant at a higher rent. The landlord may increase his rent on the basis of an interim increase in his utility costs. These costs are frequently hidden in the periodic lump sum called for by the agreement. In the event of a refund of any part of the interim increase, the landlord indeed can be said to have received a windfall. However, it would be well nigh impossible to determine what portion of all increases in rent during the interim period was attributable to this individual increase in a sewer utility rate and what portion was attributable to increases in costs of maintenance and property taxes, to the effects of inflation and to the general market forces affecting rental prices.

Therefore, analysis of the Commission's arguments reveals that there are indeed imperfections in the escrow procedure though it is not as imperfect as the Commission would have us believe. A small class of renters will always face a small

potential loss. That is, those renters entering or reentering lease agreements containing price increases based in part on an interim rate increase (which is eventually denied) will not be identified by the accounting procedures, nor is there any realistic way in which they could otherwise receive refunds. However, far from being a nefarious discrimination against renters as a group, it is merely an unfortunate incident of the security fund procedure established under AS 42.05.421(c). The fact that a relatively few renters face a small loss is not alone substantial enough to tip the balance of hardships against the utility in this case.

The Commission tries to distinguish this case from *A. J. Industries, Inc.* where the court was dealing with a permanent rate order established after a full hearing. The Commission argues that the use of preliminary injunctive relief to enjoin a temporary order of the Commission where a final order is to be forthcoming reasonably swiftly was premature and an abuse of the superior court's discretion. It cites the following language in *A. J. Industries, Inc.* in support of this conclusion:

> We read this provision [AS 44.62.-560(e)] as allowing the superior court to assert jurisdiction and grant preliminary relief in a case such as the present one, *where an agency has established a permanent rate.*[20]

However, it is clear from the context that the statement was meant to be illustrative and not exclusive, and the cases cannot be distinguished solely on the basis thereof.

However, the more difficult question presented here which underlies all of the Commission's arguments relates to the very existence of administrative discretion (supposedly conferred by statute) in cases of this sort. More specifically, the Commis--

18. By sufficiently publicizing the refund and by providing a special claims procedure for this third group, the Commission could effectively minimize the inequities and more readily identify the ultimate consumers in these cases.

19. In many cases, fixed term leases terminate and evolve into month-to-month periodic leases. In most jurisdictions, this would enable the landlord to increase the tenants' rent frequently upon relatively short notice.

20. 470 P.2d at 539 (emphasis added).

sion might legitimately inquire: if the Commission, in its discretion, cannot deny a 100 percent interim increase, having already granted an earlier 17 percent interim increase, when can it deny any proposed increase in the future? Because utilities in such cases will always be faced with potentially unrecoverable losses, because the escrow account or bond will always be available to safeguard the consumer and because the utility will usually present at least a serious or substantial question, an exasperated commission might find it difficult to conceive of a situation in which a preliminary injunction might not be properly issued by a superior court.

The Commission seeks a more restrained utilization of the superior court's injunctive powers. It states that some temporary inequity is inherent in the rate-making process, and cites authority in support of its position that interim decisions of an administrative agency should not be disturbed, particularly where an increase in the rate structure is involved, and the time in which a final rate determination will be made does not "overpass the bounds of reason".[21] The Borough also relies on a series of cases (in addition to *A. J. Industries, Inc.*) which it claims supports its position that the preliminary injunction of the interim order was appropriate.[22]

The leading United States Supreme Court decision on this subject is Prendergast v. New York Telephone Co.[23] There the court held that the temporary reduction of rates ordered by the Commission pending a final hearing was properly enjoined by the three judge district court upon a showing that the new reduced rates were confiscatory. The Supreme Court stated:

> It is well settled that the granting of a temporary injunction, pending final hearing, is within the sound discretion of the trial court; and that, upon appeal an order granting such an injunction will not be disturbed unless contrary to some rule of equity, or the result of improvident exercise of judicial discretion.[24]

■■ The Court gave three reasons for the propriety of the injunction in that case:

1) There had been a showing that the reduced rates were confiscatory. It didn't matter that the interim rates were only temporary and that the final determination was higher than the interim rates.[25]

2) No date for the final hearing had been set, and there were no indications that it would be reasonably soon. The Court stated that had an early date been fixed, this might have been a factor militating against the exercise of discretion in this case (despite the finding of a confiscatory rate).

3) The "balance of injury" was in favor of the utility—the analysis was similar to that of this court in *A. J. Industries, Inc.*

We hold that the *Prendergast* criteria are applicable to the facts of this case. The

21. Hope Natural Gas Co. v. Federal Power Com'n, 196 F.2d 803, 809, reh. denied, 197 F. 2d 522 (4th Cir. 1952), *quoting* American T. & T. Co. v. United States, 299 U.S. 232, 247, 57 S.Ct. 170, 81 L.Ed. 142, 153 (1936). *See also* Prendergast v. New York Teleph. Co., 262 U.S. 43, 43 S.Ct. 466, 67 L.Ed. 853 (1923); Mountain States T. & T. Co. v. Arizona Corporation Com'n, 331 F.Supp. 1167 (D.Ariz.1971); Mountain States T. & T. Co. v. Public Utilities Com'n, 494 P.2d 76 (Colo. 1972); New Rochelle Water Co. v. Public Serv. Com'n, 31 N.Y.2d 397, 340 N.Y.S.2d 617, 292 N.E.2d 767 (1972).

22. Banton v. Belt Line Ry. Corp., 268 U.S. 413, 45 S.Ct. 534, 69 L.Ed. 1020 (1925);

Beaver Valley Water Co. v. Driscoll, 23 F. Supp. 795 (W.D.Pa.1938); Joy v. Winstead, 70 Idaho 232, 215 P.2d 291 (1950); Baltimore Transit Co. v. Hessey, 196 Md. 41, 75 A.2d 76 (1950); City of Carrollton v. Southwestern States Tel. Co., 381 S.W.2d 401 (Tex.Civ.App.1964).

23. 262 U.S. 43, 43 S.Ct. 466, 67 L.Ed. 853 (1923).

24. *Id.* at 50–51, 43 S.Ct. at 469.

25. Such interim orders are the "final legislative acts as to the period during which they should remain in effect pending the final determination." 262 U.S. at 49, 43 S.Ct. at 469.

superior court found that the Borough's sewer utility was being operated at a large loss in the current fiscal year and had been so operated during the 1972–73 and 1973–74 fiscal years. The court found that the basic user rates of $3.75 and the interim rate of $4.40 per month were inadequate to meet the debt retirement obligations and operating and maintenance expenses of the sewer utility. In addition, the judge found that if the Borough is not allowed to charge at a $7.65 rate, pending determination by the Commission, after hearings of the July 2, 1974 revised tariff filing, the utility may be irreparably harmed because of inability to recoup losses incurred during the interim period. Those findings have not been questioned by the Commission in its petition for review.

Therefore, in effect, there has been an uncontested finding that the rates in effect prior to the granting of the injunction were confiscatory. Since the rates didn't meet costs of operation or debt retirement, we are not confronted with the question of what constitutes a constitutionally adequate rate of return, but rather with a situation where there is a complete lack of any return whatsoever.[26] No date for a final hearing had been set at the time the superior court acted, and the balance of hardships is in favor of the utility.

The Commission argues that the maximum period for which a rate can be suspended without a hearing is six months.[27] The superior court's issuance of an injunction occurred five months before the expiration of the suspension period. Moreover, the commencement of a hearing gives no assurance of a prompt decision.[28] While the possibility of reasonably swift resolution of a disputed rate should operate as a restraining influence on a court's use of its injunctive powers, disposition of the Borough's application for increased rates was not so imminent as to render the superior court's action an abuse of discretion.

We, therefore, find that the *A. J. Industries, Inc.* and *Prendergast* cases govern here, and for that reason, we entered our order affirming the action of the superior court in granting the preliminary injunction. Our affirmance, however, is not to be understood as a blanket endorsement of overruling decisions of the Commission denying interim rate increases. In fact, this court has consistently held that in certain areas of agency expertise, the appropriate standard of review is whether the decision of the administrative body had a reasonable basis.[29] This standard is invoked in cases where the agency action involves either questions of fundamental policy formulation or an assessment of techni-

---

26. Rates which do not afford a reasonable return on the value of property used in the public service have been held to be confiscatory. State v. Tri-State T. & T. Co., 204 Minn. 516, 284 N.W. 294, 305 (1939); Wichita Gas Co. v. Public Service Com'n, 2 F. Supp. 792, 799 (D.Kan.1933), modified, 290 U.S. 561, 54 S.Ct. 321, 78 L.Ed. 500 (1934). In the *Prendergast* case, the alleged rate of return on investment was found to be so low as to be confiscatory. According to the evidence presented to the superior court, the Greater Anchorage Area Borough utility was being operated at a loss, affording no rate of return and, therefore, necessarily being confiscatory.

27. AS 42.05.421(a) quoted *supra* at page 552 provides that this period can extend no longer than six months beyond the date when it would otherwise go into effect. AS 42.05.411

provides that 30 day notice to the Commission must be provided before a new or revised rate can go into effect. Thus, the total potential interim period here is seven months.

28. In the *A. J. Industries, Inc.* case, the proposal for increasing rates was filed in February 1965. A final order was not rendered by the Commission until April 8, 1969, more than four years later. 470 P.2d 537, 538.

29. Mobil Oil Corp. v. Local Boundary Comm., 518 P.2d 92, 98 (Alaska 1974); Swindel v. Kelly, 499 P.2d 291, 298 (Alaska 1972); Kelly v. Zamarello, 486 P.2d 906, 911 (Alaska 1971); Pan American Petroleum Corp. v. Shell Oil Co., 455 P.2d 12, 21–23 (Alaska 1969). *See* Ferguson-Steere Motor Co. v. United States, 126 F.Supp. 588 (N.D.Texas 1954).

cal data related to complex subject matter which requires the particularized knowledge and experience of the administrative personnel for their determination.[30] Generally speaking, the orders of a rate-making board would come within this latter class and be subject to the reasonable basis test. However, in cases where there has been a substantial showing that the existing rates are confiscatory, an administrative decision which results in the prolonged continuation of such rates will rarely be found to have a rational basis. It is at this juncture that the balance of hardships approach outlined in *A. J. Industries, Inc.* comes into play. We recognize that the balancing of hardships will almost invariably favor the utilities' position in situations such as that presented here, and it therefore should be only the beginning of the court's analysis. Thus, the primary limitations on the superior court's discretion must be found in the third aspect of the *A. J. Industries, Inc.* test and in the additional considerations discussed in *Prendergast.* Whether or not a preliminary injunction will be proper must turn on whether a "serious" and "substantial" showing that the rate is confiscatory has been made. If the party is seeking relief from an interim rate order, it must further be shown that these interim rates are likely to remain in effect for an unreasonable period pending final determination.

The United States Supreme Court in *Prendergast* recognized that there is little real functional difference between a temporary rate order and a final rate order. As far as the parties are concerned, the temporary order is the final legislative act relevant to the interim period.[31] It seems, however, that courts are usually more willing to interfere with a permanent order than with a temporary one. This is because the real difference between enjoining a temporary order as opposed to a permanent one is not so much in their legal effects, or the burden of proof, as it is the differing impacts such injunctions have on the administrative process. Constant interference with temporary orders of the Commission tends to unduly disrupt and subvert the administrative process, whereas holding a permanent order in abeyance pending final adjudication disturbs to a lesser degree the internal procedural workings of an administrative agency.

Before interfering with an interim order, the court should determine whether or not a final determination might be forthcoming from the Commission within a reasonable period of time. This is the closest question in the instant case since, although a date for a final hearing had not been set, the Commission was authorized to suspend operation of the tariff filing for an initial period not longer than six months beyond the time when it would otherwise go into effect. In the interests of preserving the integrity of the administrative process, many courts will not enjoin confiscatory rates (resulting from denial of interim increases) and will allow them to remain in effect for a reasonable time pending a final hearing.[32] However, if the interim order temporarily reduces the rate to a level which is confiscatory, or if the company is currently operating at a loss due to pre-existing confiscatory rates or to the denial of an interim increase, the courts are much more apt to intervene immediately on the utility's behalf.[33] This is due, in part, to

30. Swindel v. Kelly, 499 P.2d at 298–99.

31. *See* note 25 *supra.*

32. *See* Prendergast v. New York Telephone Co., 262 U.S. 43, 43 S.Ct. 466, 67 L.Ed. 853 (1923); Hope Natural Gas Co. v. Federal Power Com'n, 196 F.2d 803, 808–09 (4th Cir. 1952); Mountain States T. & T. Co. v. Arizona Corporation Com'n, 331 F.Supp. 1167 (D.Ariz.1971); Mountain States T. & T. Co. v. Public Utilities Com'n, 494 P.2d 76 (Colo. 1972).

33. *See* Beaver Valley Water Co. v. Driscoll, 23 F.Supp. 795 (W.D.Pa.1938); New Rochelle Water Co. v. Public Serv. Com'n, 31 N.Y.2d 397, 340 N.Y.S.2d 617, 292 N.E.2d 767 (1972).

the fact that courts are much more likely to find that a reduced rate or a rate which does not provide for operating expenses is confiscatory in the first place.

Therefore, in the instant case, since the superior court found that the existing rate was confiscatory, since the Borough was clearly operating the sewer utility at a great loss, since the period prior to a final hearing could be construed to be unreasonable, and since the Commission failed to provide any further justification for its decision, the denial of the interim rate increase was arbitrary, and the superior court's injunction voiding the Commission's order did not constitute an abuse of its discretion.

Affirmed.