STATE of Alaska and Carl Rosier, in his official capacity as Commissioner of the Department of Fish and Game, Petitioners,

v.

KLUTI KAAH NATIVE VILLAGE OF COPPER CENTER, Respondent.

No. S–4712.

Supreme Court of Alaska.

May 8, 1992.

James Cantor, Asst. Atty. Gen., Anchorage, and Charles Cole, Atty. Gen., Juneau, for petitioners.

Robert T. Anderson, Lawrence A. Aschenbrenner, Bart T. Garber, Native American Rights Fund, Anchorage, for respondent.

William E. Caldwell, Alaska Legal Services, Fairbanks, and Carol H. Daniel, Alaska Legal Services, Anchorage, for amicus curiae Morry.

John Sky Starkey, Bethel, for amicus curiae Kwethluk.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

We granted this emergency petition to review the superior court's issuance of a preliminary injunction which, essentially, replaced the State Board of Game's seven day general moose hunt with a twenty-six day subsistence hunt for residents of the Kluti Kaah Native Village of Copper Center. The state contends that the superior court misapplied the "balance of hardships" test in issuing the injunction and, generally, overstepped its authority. Kluti Kaah responds that the court's equitable powers were properly invoked to protect them from an illegal regulation and that the court crafted an injunction which adequately protected the interests of the state and the general public. We agree with the state that the injunction should not have been issued. Specifically, we conclude that the superior court failed to give due consideration to the state's interest in developing and maintaining a uniform system of game allocation and that its decree did not adequately protect the interests of other subsistence hunters or guard against depletion of the moose population.[1]

I

The parties are in substantial agreement regarding the facts of this case, at least as concerns the injunction. In March 1991, the Board of Game met and after lengthy discussion, established a seven day season to hunt moose in Game Management Unit 13. The hunt was open to both sport and subsistence hunters and was scheduled for September 5–11, 1991. The length of the hunt was designed to allow for a harvest of 600 moose and was partly based on estimates of average times spent in the field by successful and unsuccessful hunters.

Transcripts of the Board's discussion make it clear that the Board originally wanted to have a short season for sport hunters and a longer "Tier II hunt" for subsistence hunters.[2] In past seasons, this

---

1. Although both sides forcefully argue the merits of their underlying positions concerning the legality of the Board of Game regulation, we find it unnecessary to address their arguments at this stage of the litigation.

2. We explained the "tiers" established by our subsistence law in *Madison v. Alaska Dep't of Fish & Game,* 696 P.2d 168, 174 (Alaska 1985). There are potentially two tiers of subsistence users under AS 16.05.258(c). The first tier includes all subsistence uses. Under the statute, all subsistence uses have priority over sport and commercial uses "if the harvestable portion [of a fish or game population] is not sufficient to accommodate all consumptive uses of the stock or population, but is sufficient to accommodate subsistence uses of the stock or population." AS 16.05.258(c) (1987). If the statutory priority given all subsistence users still results in too few

was done. The Department of Law, however, advised the Board that a separate subsistence hunt would not be legal if there were enough moose to support both a sport and subsistence hunt. This advice was based on the Department's interpretation of Alaska subsistence law following *McDowell v. State*, 785 P.2d 1 (Alaska 1989). Ultimately, the Board abandoned the idea of separate hunts and adopted the seven day general hunt.

In the summer of 1991, the residents of Kluti Kaah sought a preliminary injunction prohibiting the state's enforcement of the seven day hunt and requesting that the court establish a longer subsistence hunt for their benefit. Kluti Kaah filed a single affidavit with the superior court to support its claim for injunctive relief.[3]

On August 16, 1991, Judge Katz issued the preliminary injunction giving rise to this petition after finding that (1) the harm to Kluti Kaah residents in missing their traditional hunt would be irreparable; (2) the interests of the state and the public could be adequately protected; and (3) the case raised serious and substantial questions. The injunction prohibited the state from enforcing the seven day moose hunt against the 267 residents of Kluti Kaah. The injunction then provided that "the Board [of Game] may enforce a season of no less than August 25, 1991 to September 20, 1991." The superior court entered a supplemental order, on August 21, that limited the Kluti Kaah residents to a harvest of no more than forty moose and required that they obtain permits.

We issued a stay of the preliminary injunction on August 23, 1991 and granted the state's petition for review on August 29, 1991. On August 23, seven other Native villages sought expedited relief from the superior court in order to partake in the expanded hunt.

## II

In her order,[4] Judge Katz specifically applied the "balance of hardships" approach to preliminary injunctions that we adopted in *A.J. Industries, Inc. v. Alaska Public Service Comm'n*, 470 P.2d 537 (Alaska 1970), *modified in other respects*, 483 P.2d 198 (Alaska 1971):

> [T]he rule requiring a clear showing of probable success applies in situations where the party asking for relief does not stand to suffer irreparable harm, or where the party against whom the injunction is sought will suffer injury if the injunction is issued, [but] a different rule applies where the party seeking the injunction stands to suffer irreparable harm and where, at the same time, the opposing party can be protected from injury....
>
> ....
>
> This approach is termed the "balance of hardships" approach. The balance of hardships is determined by weighing the harm that will be suffered by the plain-

fish or game for all subsistence uses, then the Board is authorized to establish a second tier of preferred subsistence users based on legislative criteria expressed in AS 16.05.258(c)(1), (2) and (3), namely, customary and direct dependence on the resource, local residency, and availability of alternative resources.

It appears that the expression "Tier II hunt" has been adopted by fish and game regulators to refer to hunts open exclusively to subsistence users. Inasmuch as this term derives from the language we employed in *Madison*, it is not strictly accurate. A hunt open to all subsistence hunters is actually a tier I hunt.

3. In the affidavit, Kenneth Johns, a member of the Tribal Council for Kluti Kaah Native Village, claimed that the season was simply a "sport hunt" and did not afford his people an opportunity to conduct their traditional moose

hunt or pass on their heritage to their children. He also predicted that the short hunting season would not provide sufficient moose to meet the subsistence needs of the Kluti Kaah residents.

4. In reviewing Judge Katz' order, we apply an abuse of discretion standard. In *Alaska Public Utilities Comm'n v. Greater Anchorage Area Borough*, 534 P.2d 549 (Alaska 1975), we quoted with approval the following standard of review:

> It is well settled that the granting of a temporary injunction, pending final hearing, is within the sound discretion of the trial court; and that, upon appeal an order granting such an injunction will not be disturbed unless contrary to some rule of equity, or the result of improvident exercise of judicial discretion.

*Id.* at 557 (quoting *Prendergast v. New York Tel. Co.*, 262 U.S. 43, 50–51, 43 S.Ct. 466, 469, 67 L.Ed. 853 (1923)).

tiff if an injunction is not granted, against the harm that will be imposed upon the defendant by the granting of an injunction.

*Id.* at 540 (footnotes omitted). We have since distilled the "balance of hardships" rule of *A.J. Industries* to a three-part test: "(1) the plaintiff must be faced with irreparable harm; (2) the opposing party must be adequately protected; and (3) the plaintiff must raise 'serious' and substantial questions going to the merits of the case; that is, the issues raised cannot be 'frivolous or obviously without merit.'" *Messerli v. Department of Natural Resources*, 768 P.2d 1112, 1122 (Alaska 1989) (citing and quoting *Alaska Public Utilities Comm'n v. Greater Anchorage Area Borough*, 534 P.2d 549, 554 (Alaska 1975)).

We recently applied this rule in reviewing a temporary restraining order which benefited commercial fishermen at the expense of subsistence users. *See State v. United Cook Inlet Drift Ass'n*, 815 P.2d 378 (Alaska 1991). In reversing the order, we noted that the "serious and substantial question" standard:

> applies only where the injury which will result from the temporary restraining order or the preliminary injunction can be indemnified by a bond or where it is relatively slight in comparison to the injury which the person seeking the injunction will suffer if the injunction is not granted.

*Id.* at 378–79 (citations omitted).

1. *Irreparable Injury* [5]

The superior court found that the residents of Kluti Kaah could suffer two types of harm if the injunction were not issued: (1) the residents' 1991–92 winter subsistence needs for moose could go unfulfilled, and (2) they would be denied the ability to pass on to their children their traditional and customary method of subsistence hunting.

The state argues that Kluti Kaah's alleged injury is neither certain nor irreparable. Kluti Kaah's factual showing in support of its claim of irreparable harm consisted, in its entirety, of a single affidavit containing the obviously self-interested statements of a single village resident. Such evidence cannot establish with any genuine certainty that Kluti Kaah's residents could not meet their subsistence needs for moose during the shortened hunt. However, without delving into the merits of the case, we are unable to definitely conclude that Kluti Kaah has failed to establish irreparable injury as a result of the shorter hunt. Judge Katz noted the weakness in Kluti Kaah's showing, but still ruled that Kluti Kaah had shown irreparable injury. We will assume, for purposes of this opinion, that her ruling on this point was correct.

2. *Adequate Protection*

■ In her order, Judge Katz stated:

> Should the only change in the hunt be the extension of the season for the members of Kluti Kaah, the court can perceive no adverse impact on the state from a procedural standpoint. Nor would the public in general or sports hunters in particular suffer any material infringement of hunting opportunity or diminution of the moose population. With a cap of 40 moose, any advantage obtained by the people of Kluti Kaah would be *de minimis*.

The state strenuously disagrees with the court's assessment of the harm caused by the issuance of the injunction. It claims that the injunction interferes with its role as protector of the resource. It also maintains that other subsistence users, whom it represents and whose interests the court must consider, are inadequately protected by this order.[6] We agree.

---

**5.** "Irreparable injury" "includes an injury, whether great or small, which ought not to be submitted to, on the one hand, or inflicted, on the other; and which, because it is so large or so small, or is of such constant and frequent occurrence, or because no certain pecuniary standard exists for the measurement of dam-

ages, cannot receive reasonable redress in a court of law." Black's Law Dictionary, 786 (6th Ed.1990).

**6.** Kluti Kaah argues that other hunters are neither helped nor harmed by the injunction because the seven day general hunt remains in

The trial court failed to consider the clear ramifications of its decision. Although the forty moose limit imposed by the court may adequately protect the moose population if no other similarly situated groups seek an extended hunting season, the superior court can in no way ensure that others will not seek similar relief. If this distinct possibility, in fact, occurs, we question the court's acumen, given the procedural and substantive limitations of a trial setting, to accurately determine when the moose population is taxed.[7]

It was evident at the time the court issued the injunction that Kluti Kaah residents were being advantaged when compared to other subsistence hunters. They would not have to compete with the others, could be more opportunistic in deciding when to hunt, and would have more time in which to bag their limit. It should have also been evident that other similarly situated groups would want the same advantages and would begin a rush to the courthouse.[8] This likelihood has now been borne out by the seven other Native villages that have filed suit.

 In determining whether to issue a preliminary injunction, the trial court should have considered the threat that multiple injunctions would represent to the moose population and the problems it would create for orderly game allocation.[9] Its failure to do so constitutes an abuse of discretion.

### 3. "Serious Question" Standard

 The party seeking a preliminary injunction is required to make a clear showing of probable success on the merits when they do "not stand to suffer irreparable harm, or where the party against whom the injunction is sought will suffer injury if the injunction is issued." *A.J. Industries*, 470 P.2d at 540.

The trial court explicitly applied the "serious and substantial question" standard because it concluded that the balance of hardships clearly tipped toward the residents of

---

effect for them. They also claim that the State presented no evidence at trial showing any harm to the resource due to the injunction. Finally, they argue that Judge Katz was not required to fashion a remedy that includes everyone who may have been injured by the Board's action, but merely to provide relief for those before her court. While Kluti Kaah's arguments may be correct, they miss the point of the "adequate protection" requirement.

7. Judge Holland addressed this concern in *John v. Alaska*, A85–698, Unpublished Order at 5 (D.Alaska Jan. 19, 1990):

> Firstly, the Board must bring considerable expertise to the complex fish management questions that come before it. This court does not have that expertise. While the court is quite comfortable ... in its role as the reviewer of agency rule-making ..., the court should not—for lack of expertise—make the fine scientific wildlife management decisions that are called for by state and federal law. In short, the fish and game management ought to be done by the fish and game managers.

See also *Meier v. State*, 739 P.2d 172, 174 (Alaska 1987).

8. The dissent maintains that our "rush to the courthouse fears" may be allayed by the use of consolidation and class-certification. In fact, Judge Katz made no attempt to certify as a class the other subsistence users of the resource or consolidate the litigation. Therefore, we fail to see how the mere existence of these well-recognized procedures repairs the defects of the injunction in this case.

9. In *Alaska Public Utilities Comm'n*, 534 P.2d at 553, we noted that:

> the propriety of issuing an injunction turns, in part, on weighing the demands of justice in the individual case against the interest in avoiding undue interference with the administrative process. In cases such as [this] one where an interim rate increase is being sought by a utility, *there is the danger of a too frequent resort to the injunction by the superior courts which, in turn, might cause the administrative commission automatically to grant such increases (having been effectively deprived of any real discretion in the matter).* (emphasis added).

A similar concern is apparent in the area of game management. We also note that, in this case, the superior court's preliminary injunction was not only prohibitory in nature (i.e., precluding the state from enforcing its seven-day hunt against Kluti Kaah residents) but was also mandatory in that it *established* a 26–day moose hunt exclusively for Kluti Kaah. It is well settled that:

> a mandatory injunction will seldom be granted before final hearing, and ... should be granted only in extreme or exceptional cases [and] ... with great caution.

42 Am.Jur.2d *Injunctions* § 21 (1969).

Kluti Kaah. Our assessment of the balance of hardship is considerably different, and therefore we conclude that the trial court applied the wrong standard to the case.

Accordingly, we hold that the superior court failed to adequately weigh and protect the interests of the state, other hunters, or the resource in issuing its injunction. Since the state's interests were significantly harmed by the injunction, the trial court should have also required Kluti Kaah to make a clear showing of probable success on the merits. We therefore VACATE the injunction and return the case to the superior court for further proceedings on the merits.

RABINOWITZ, Chief Justice, with whom COMPTON, Justice, joins dissenting.

I would affirm the superior court's issuance of a preliminary injunction in the circumstances of this case.

In deciding to issue a preliminary injunction the superior court applied the "serious and substantial question"[1] standard and found that the Kluti Kaah would suffer two forms of harm unless an injunction was issued: more particularly, the court concluded that the Kluti Kaah would be denied the opportunity to transmit knowledge of traditional and customary hunting patterns to their children, and that their 1991–92 winter subsistence needs for moose could possibly go unfulfilled. Since the Kluti Kaah established both irreparable injury and substantial questions going to the merits, I am of the view that the superior court did not err in granting Kluti Kaah a preliminary injunction.

Kluti Kaah claimed that the seven day season would irreparably harm them because they will be denied the ability to maintain and transmit to their children knowledge of the Ahtna people's traditional and customary methods of subsistence hunting. The superior court agreed, noting:

> There is no question that the traditional Ahtna method of hunting this game population encompassed much more protracted opportunities to engage in this activity with the younger generation. To compress the long standing custom into a sport hunter's seven-day 'vacation' is to legislate a substantial departure from the historical subsistence hunting experience.

The superior court concluded that the provisions of AS 16.05.258(f)[2] supported the Kluti Kaah's contention that the Board was obligated to consider customary and traditional hunting patterns (methods and means), not just quantitative requirements, in determining the appropriate length of season for the moose hunt in question.[3] The superior court interpreted the length of time which Kluti Kaah members needed to traditionally harvest moose to come within the ambit of "means" as used in AS 16.05.258(f).[4] Because the Board failed to consider the historical duration of the Ahtna people's traditional and customary patterns of hunting moose in the relevant game management unit the superior court concluded that:

---

**1.** In *State v. United Cook Inlet Drift Ass'n,* 815 P.2d 378 (Alaska 1991), we said that this standard:

> applies only where the injury which will result from the temporary restraining order or the preliminary injunction can be indemnified by a bond or where it is relatively slight in comparison to the injury which the person seeking the injunction will suffer if the injunction is not granted.

(Citations omitted), *id.* at 379.

**2.** AS 16.05.258(f) provides in relevant part:

> Takings authorized under this section are subject to reasonable regulations of seasons, catch or bag limits, and methods and means.

**3.** The superior court additionally relied on the text of AS 16.05.258(c) which reads in part:

> The boards shall adopt subsistence fishing and subsistence hunting regulations for each stock and population for which a harvestable portion is determined to exist under (b)(1) of this section.... If it is necessary to restrict subsistence fishing or subsistence hunting in order to assure sustained yield or continue subsistence uses, then the preference shall be limited, and the boards shall distinguish among subsistence users, by applying the following criteria: ....

**4.** See note 2, *supra,* for the text of AS 16.05.-258(f).

[I]t is highly questionable whether the Board was 'reasonably' regulating the season in this case, when it failed to take the historical hunting period into account.

The superior court's reasoning is sound. The provisions of AS 16.05.258(c) and (f) required the Board to consider traditional and customary methods and means of hunting in determining the length of the moose hunting season. In *Madison v. Alaska Department of Fish & Game*, 696 P.2d 168 (Alaska 1985), we held that "the phrase 'customary and traditional' modifies the word 'uses' in [the statute]. It does not refer to users." *Id.* at 174. However, we also stated that,

> [t]he legislative history indicates that the legislature intended to protect subsistence use, not limit it. The words 'customary and traditional' serve as a guideline to recognize historical subsistence use by individuals, both [N]ative and non-[N]ative Alaskans.

*Id.* at 176.

"[C]ustomary and traditional" uses is employed to modify and define "subsistence uses" in AS 16.05.940(30) as follows:

> "subsistence uses" means the noncommercial, **customary and traditional** uses of wild, renewable resources by a resident ... for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation, for the making and selling of handicraft articles out of nonedible by-products of fish and wildlife resources taken for personal or family consumption, and for the customary

trade, barter, or sharing for personal or family consumption....

(Emphasis added.) "Subsistence hunting" is defined by AS 16.05.940(29) as follows:

> "subsistence hunting" means the taking of, hunting for, or possession of game by a resident ... of the state for **subsistence uses** by means defined by the Board of Game; [5]

(Emphasis added.) Since "subsistence hunting" incorporates "subsistence uses," and "subsistence uses" contemplates "customary and traditional uses," reading the subsistence statute as a whole leads me to conclude that subsistence hunting encompasses customary and traditional use patterns, methods and means.

In addition to the above, I am of the view that the Kluti Kaah established irreparable harm in connection with their claim that given the truncated hunting season, their winter subsistence needs could possibly go unfulfilled. In previous years, Kluti Kaah members enjoyed a substantially longer hunting period.[6] As the superior court found, the Board established a seven day general hunt. The limited hunt was imposed on the Kluti Kaah even though the state's own expert from the Subsistence Division, Dr. James Fall, made it clear that a shortened season would not satisfy traditional harvest practices. In the course of discussing the merits of a shortened season at the Board's March 1991 meeting, Dr. Fall stated:

> We know from working with subsistence hunting and fishing systems is [sic] that one important aspect that I think

---

**5.** Under AS 16.05.940(31) "take" is defined in the following manner:

> "take" means taking, pursuing, hunting, fishing, trapping, or in any manner disturbing, capturing, or killing or attempting to take, pursue, hunt, fish, trap, or in any manner capture or kill fish or game;

**6.** The regulatory history for moose taken in the Copper River Basin since statehood was summarized for the Board of Game at its March 1991 meeting by Dr. James Fall, an anthropologist with the Subsistence Division of the Alaska Department of Fish and Game:

> I reviewed it back to 1959 and it looks like the shortest period that we've had available to subsistence hunters in that unit is 20 days, it was as long as 50 days back in the 50's and

60's and through much of the early 1980's, there was a 20 day season available to subsistence hunters and in about '86 or '87 the board added on 6 days at the beginning of the season for subsistence hunters, it was a subsistence only season.... [sic]

The state now asserts that there was no reduction in hunting days this year because only five days were provided last year, so that the "status quo from the perspective of the hunter is five days." The state's argument is unpersuasive because in addition to the general five day fall hunt, Kluti Kaah members also had a 31 day Tier II season in December, for a total of 36 hunting days. *See* 5 AAC 85.045(11) (July 1991 Supp.).

the boards have tried to provide for in the management system is flexibility and, in other words providing windows. of opportunity for people to engage in hunting and fishing efforts, certainly an average of about six days might be what people spend but of course those six days might come at different times within that larger window of opportunity. We know that people's choices, decisions about when to hunt are influenced by a variety of factors, one of the major ones of course is where the animals are in relation to a particular communities' traditional hunting area or access place, weather of course plays a major role in choosing when to go hunting and poor weather can pretty much eliminate hunting opportunity in a short season. Likewise, other kinds of subsistence activities that are taking place within a period of time also influence the choice of just what to do and could preclude a particular activity if the window of opportunity was rather short.

Another issue in the Copper Basin has been the issue of hunter numbers and crowding we do know that large numbers of hunters in the field in a short period of time can inhibit hunting or inhibit hunting success.

The Board rejected Dr. Fall's advice despite the statutory mandate that the Subsistence Division "participate with other divisions in the preparation of statewide regional management plans so that those plans **recognize and incorporate the needs** of subsistence users of fish and game." AS 16.05.094(7) (emphasis added).

I also must note my disagreement with the court's conclusion that the superior court erred in its conclusion that the injury or harm to the public and the state would be insignificant. In regard to this issue the superior court stated:

Plaintiff essentially seeks only that it be allowed a period from August 25 through September 20 to conduct its subsistence hunt. The Board already incorporated Kluti Kaah's need for 40 moose into the 600 moose limit. There is no evidence before the court to suggest that extending the time period for plaintiff's members to conduct their hunt would significantly impact the total numbers of moose harvested.

Such a remedy would benefit a particular subgroup of subsistence users. Such relief would not, however, be based on a rural preference or on any other prohibited classification. Plaintiff's members would receive favorable treatment only because (1) they brought this action; and (2) the impact on the state and other moose hunters of affording this relief to Kluti Kaah can be evaluated based on the existing record.

Should the only change in the hunt be the extension of the season for the members of Kluti Kaah, the court can perceive no adverse impact on the state from a procedural standpoint. Nor would the public in general or sports hunters in particular suffer any material infringement of hunting opportunity or diminution of the moose population. With a cap of 40 moose, any advantage obtained by the people of Kluti Kaah would be *de minimus*.

*State v. Kluti Kaah*, No. 3AN–91–04554 CI (Alaska Super., August 16, 1991).

I cannot find an abuse of discretion in the superior court's analysis and resolution of this issue. The Kluti Kaah persuasively argue that other moose hunters in the affected unit are neither assisted nor harmed by the terms of the preliminary injunction since the seven day general hunt remains in effect for them and no evidence was adduced by the state that the injunction would result in harm to the particular moose resource. Nor did the superior court's injunction impinge on the Board's expertise since the Board had previously allotted 40 moose for the Kluti Kaah in its overall determination that 600 moose could be taken in the season and game unit in question.

Admittedly, it is unfortunate that the Kluti Kaah had to resort to the courts for vindication of their customary and traditional subsistence hunting patterns. Nevertheless, such action is well within the traditions of our legal system which afford

litigants the opportunity to obtain a determination as to the legality of the substantive content of a particular regulation in light of constitutional or controlling statutory criteria. *See* AS 44.62.300 [7]; *see also Powers v. Public Employees' Retirement Bd.*, 757 P.2d 65, 67 (Alaska 1988) (supreme court may review administrative regulations to determine if they are within the statutory authority granted to agency by legislature); *Madison v. Alaska Dep't of Fish & Game*, 696 P.2d 168, 173 (Alaska 1985) (statutory interpretation of the words "customary and traditional" and the question of whether the board has acted within the scope of its authority fall into the realm of special competency of the courts). The rush to the courthouse fears of the majority can ordinarily be attenuated and accommodated by established procedures which permit consolidation,[8] or class certification [9] where appropriate [10], and by restraint on the judiciary's part when the circumstances permit deference to the administrative agency's initial determination of the particular issue. *Cf.* 4 KENNETH CULP DAVIS, ADMINISTRATIVE LAW TREATISE § 22:1, 81 (1983) ("Primary jurisdiction is a doctrine of common law, wholly court-made, that is designed to guide a court in determining whether and when it should refrain from or postpone the exercise of its own jurisdiction so that an agency may first answer some question presented."); *see also State v. Zia Inc.*, 556 P.2d 1257, 1262 (Alaska 1976) (under doctrine of primary jurisdiction a court may stay or dismiss pending litigation so as to enable agency to initially pass on an aspect of the case calling for administrative expertise).

I would affirm the superior court's preliminary injunction for the reasons stated by that court, namely:

> Because plaintiff has established irreparable injury and substantial questions going to the merits, and because plaintiff has further demonstrated that if limited relief is afforded Kluti Kaah, the harm to the state and the public will be insignificant, the balance of hardships tilts clearly in plaintiff's favor.

*State v. Kluti Kaah*, No. 3AN–91–04554 CI (Alaska Super., August 16, 1991).

---

**7.** AS 44.62.300 provides in relevant part:

> **Judicial review of validity.** An interested person may get a judicial declaration on the validity of a regulation by bringing an action for declaratory relief in the superior court. In addition to any other ground the court may declare the regulation invalid (1) for a substantial failure to comply with AS 44.62.010—44.62.320, . . . .

**8.** Alaska Civil Rule 42(a) provides:

> When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay. . . .

**9.** Alaska Civil Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

**10.** I note that in the instant case the record shows that the original preliminary injunction was granted on August 16, 1991, prohibiting the state from enforcing the seven-day general moose hunt against the 267 residents of Kluti Kaah. Thereafter the superior court entered a supplemental order on August 21 that limited the Kluti Kaah residents to a harvest of no more than forty moose. On August 23, 1991, seven additional Native villages filed an expedited request to share in the Kluti Kaah hunt. However, this court entered a stay of the superior court's preliminary injunction on the same day, August 23, 1991, pending announcement of this court's decision whether to grant or deny the state's petition for review.