*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| STATE OF ALASKA, OFFICE OF THE LIEUTENANT GOVERNOR, DIVISION OF ELECTIONS, and DIRECTOR GAIL FENUMIAI, in an official capacity,<br><br>               Petitioners,<br><br>    v.<br><br>ARCTIC VILLAGE COUNCIL, LEAGUE OF WOMEN VOTERS OF ALASKA, ELIZABETH L. JONES, and BARBARA CLARK,<br><br>               Respondents. | Supreme Court No. S-17902<br><br>Superior Court No. 3AN-20-07858 CI<br><br>O P I N I O N<br><br>No. 7556 – September 17, 2021 |

Petition for Review from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Dani Crosby, Judge.

Appearances: Laura Fox, Lael Harrison, and Margaret Paton Walsh, Assistant Attorneys General, Anchorage, and Clyde "Ed" Sniffen, Jr., Acting Attorney General, Juneau, for Petitioners. Natalie Landreth, Matthew N. Newman, and Wesley James Furlong, Native American Rights Fund, Anchorage, for Respondent Arctic Village Council; Stephen Koteff, Joshua Decker, and Aadika Singh, ACLU of Alaska Foundation, Anchorage, and Dale E. Ho, American Civil Liberties Union, New York, for Respondents League of Women Voters of Alaska, Elizabeth Jones, and

Barbara Clark; and Ezra D. Rosenberg, Pooja Chaudhuri, and Natasha Chabria, Lawyers' Committee for Civil Rights Under the Law, Washington, D.C., for all Respondents.

Before: Bolger, Chief Justice, Winfree, Maassen, Carney and Borghesan, Justices.

MAASSEN, Justice.

## I. INTRODUCTION

About two months before the 2020 general election, a village government, a nonpartisan political organization, and two individual Alaska voters sought to enjoin the State from enforcing a statute that requires absentee ballots to be witnessed by an official or other adult. They argued that, under the unusual circumstances posed by the COVID-19 pandemic, the witness requirement unconstitutionally burdened the right to vote. The superior court granted a preliminary injunction, concluding that the State's interests in maintaining the witness requirement were outweighed by the burden that requirement would impose on the right to vote during times of community lockdowns and strict limits on person-to-person contact. The court also rejected the State's laches defense, reasoning that the unpredictability of the pandemic's course made it reasonable for the plaintiffs to wait as long as they did before filing suit.

The State filed a petition for review. After an expedited oral argument we affirmed the superior court's decision, finding no abuse of discretion. This opinion explains our reasoning.

## II. FACTS AND PROCEEDINGS

### A. The Witness Requirement

An Alaska statute requires that voters who vote absentee have a witness.[1]

---

[1] AS 15.20.081(d).

Compliance with this requirement takes one of two forms. Under the first, voters must mark their ballot, "place the ballot in the secrecy sleeve, . . . place the secrecy sleeve in the envelope provided, and . . . sign the voter's certificate on the envelope," all "in the presence of a notary public, commissioned officer of the armed forces including the National Guard, district judge or magistrate, United States postal official, registration official, or other person qualified to administer oaths . . . who shall sign as attesting official and shall date the signature."[2] Under the second procedure — available "[i]f none of the officials listed in this subsection is reasonably accessible" — the voter "shall sign the voter's certificate in the presence of an individual who is 18 years of age or older, who shall sign as a witness and attest to the date on which the voter signed the certificate in the individual's presence"; the voter shall also "certify, . . . under penalty of perjury, that the statements in the voter's certification are true."[3]

As set out on the sample ballot the Division submitted to the superior court, there is no requirement that the witness — whether an official or other adult — know the voter, ask for identification, or confirm the voter's eligibility to vote; the witness's only obligation is to certify that the voter signed the voter's certificate in the witness's presence.[4]

B.     The Lawsuit And Request For Injunctive Relief

The 2020 general election was scheduled for November 3. On September 8

---

[2]     *Id*.

[3]     *Id*.

[4]     A regulation requires that voters provide identification either at the time they apply for an absentee ballot by mail or when signing the voter's certificate on the absentee ballot's return envelope. 6 Alaska Administrative Code (AAC) 25.510(a)(1) and (3) (2021). But the certifying witness's obligation does not extend to confirming the voter's identity. *See* AS 15.20.081(d).

the Arctic Village Council, the League of Women Voters of Alaska, and two individuals, Elizabeth L. Jones and Barbara Clark, filed a complaint in superior court seeking to enjoin enforcement of the absentee ballot witness requirement for the upcoming election. They asserted that the Council, a federally recognized tribal government, was "responsible for the health, safety, and welfare of its members"; "that COVID-19-related deaths among Native communities [were] highest [of] any demographic group in the United States"; and that the Council was taking strict measures to control the spread of the virus, including, most recently, "a community-wide shelter in place order that restricted all residents from gathering with any person outside of their households and prohibited residents from congregating at community facilities." They asserted that the witness requirement "serve[d] as an absolute bar for many members who are self-isolating, do not have access to a notary because of shelter-in-place requirements, and do not have [anyone] at least eighteen years old to sign and witness their signing absentee ballots."

The complaint described the League of Women Voters of Alaska as "a nonpartisan political organization that works to encourage informed and active participation in government," with several hundred members "throughout Alaska," many of whom are "senior citizens and . . . therefore particularly vulnerable to COVID-19." It alleged that the witness requirement could make its members "face a choice between risking their health in order to vote or not voting at all."

The complaint identified the first individual plaintiff, Jones, as a 71-year-old Alaskan who lived "alone in a log cabin in Fairbanks" and had voted in every general election for the past 50 years. The complaint asserted that Jones was "at increased risk [of] severe illness from COVID-19 because [of her] underlying health conditions: high blood pressure, obesity, and [pulmonary disease]." The complaint alleged that Jones had "been self-isolating at her home since late February, only leaving

her home when necessary and choosing curbside service for groceries, prescription drugs, garbage drop-off, and veterinarian service for her dog in order to avoid contact with others." According to the complaint, Jones had no ready access to a notary or any other adult who could witness her absentee ballot; the complaint noted that "because of a recent [United States Postal Service] directive, [Jones's] letter carrier [would] not be allowed to witness her ballot in the general election." Jones believed that the witness requirement would force her "to choose between her right to vote and an unacceptable risk to her health."

The allegations regarding the other individual plaintiff, Clark, were similar. Clark was 72 years old and lived alone; she considered herself "a 'super voter' and [had voted] in every major election." Like Jones, Clark had "underlying health conditions that put her at increased risk [of] severe illness from COVID-19: high blood pressure and obesity." The complaint alleged that Clark had been "self-isolating," leaving home only for "necessities" like medical appointments and COVID testing. According to the complaint, Clark wanted to vote by mail but lacked ready access to a notary or other adult witness. And like Jones, she believed that the witness requirement would force her to choose between voting and "an unacceptable risk to her health."

As more general background to the plaintiffs' claims, the complaint detailed the history of COVID-19, focusing on its severity in the United States and particularly among "racial minority groups, such as Native Americans and Alaska Natives." The complaint cited the advice of the Centers for Disease Control and Prevention (CDC) regarding social distancing and minimizing person-to-person contact in order to "reduce the spread of COVID-19." The complaint noted infectious disease experts' predictions that the virus would continue to spread, as well as the experts' fears about the impact of in-person voting on case counts. Turning to Alaska's experience in particular, the complaint described the public health measures taken by the State and local

governments, including travel restrictions and stay-at-home orders in a number of communities.

For its specific claims for relief, the complaint alleged that maintaining the witness requirement during the pandemic's restrictions on person-to-person contact would violate voters' constitutional rights to vote[5] and to equal protection of the laws.[6] As remedies, the complaint sought a declaratory judgment that the witness requirement was "unconstitutional and invalid during the COVID-19 pandemic"; an injunction against enforcement of the witness requirement during the pandemic; and orders requiring the Division of Elections to modify election materials to reflect the suspension of the witness requirement, to educate the public about the change, and to count otherwise valid absentee ballots.

The plaintiffs also filed a motion for a preliminary injunction, supported by the declarations of Jones and Clark as well as the declaration of Tiffany Yatlin, an Arctic Village administrator. Yatlin described the effects of the pandemic in Arctic Village and the challenges faced by its residents. She attested that despite strict social-distancing guidelines, the village of 150 residents had "at least three documented cases" of infection, and that "community members [had] to be medevacked by air ambulance because of complications related to COVID-19." Yatlin explained that the village has only one small clinic, staffed by a single health aide, and that the nearest hospital is in Fairbanks, 233 air miles away.

---

[5]     The Alaska Const., art V, § 1 provides in relevant part: "Every citizen of the United States who is at least eighteen years of age, who meets registration residency requirements which may be prescribed by law, and who is qualified to vote under this article, may vote in any state or local election."

[6]     The Alaska Const., art I, § 1 provides in relevant part: "This constitution is dedicated to the principles . . . that all persons are equal and entitled to equal rights, opportunities, and protection under the law."

Yatlin attested that the Arctic Village Council had established strict social-distancing guidelines in early March, closing all facilities to the public and ordering staff to work from home. It closed the village to outside visitors a month later and restricted all air carrier passenger service into the community. To further combat the spread of the virus, the Council issued a community-wide shelter-in-place order, preventing residents from gathering with anyone outside their household and prohibiting people from congregating at community facilities like the post office, the village store, and the community hall. Yatlin attested that there were at least 50 people in the community who did not have another adult in the household to act as a witness for purposes of absentee voting. She concluded that because many residents would have to leave their homes to satisfy the witness requirement, "there [was] no way . . . people [could] fully participate in the upcoming general election with the current restrictions on mail in ballots in place."

## C.    The State's Response

The State filed an opposition to the motion for preliminary injunction and a cross-motion to dismiss the suit. It argued that the suit was barred by laches because the plaintiffs had waited too long to seek relief and, alternatively, that the standards for the issuance of a preliminary injunction were not met. The State supported its position with the affidavits of Gail Fenumiai, Director of the Division of Elections, and other Division employees.

Fenumiai explained the many challenges the Division faced in planning the 2020 primary and general elections during the COVID-19 pandemic, including keeping polling places and poll workers safe from infection. She described the absentee voting process, from the voter's application for an absentee ballot through the Division's review of the ballots cast. She described the work the Division had done to help ensure that in-person voting could occur, including in locations with shutdown orders. She also

described the efforts that had already gone into preparing and distributing absentee ballots, training election workers how to review and log absentee ballots, and educating the public about their requirements.

The affidavit of Jeremy Johnson, Elections Supervisor of the Division's Fairbanks office, described his communications with officials in Arctic Village seeking to ensure that village residents could vote absentee despite the shutdown. He attested that a local official had "agreed to go door-to-door on his patrols to offer the opportunity to vote absentee-in-person to any voter who had not already voted." Carol Thompson, Operations Manager of the Division's Anchorage office, described "irregularities in absentee ballot applications" in two prior elections. She explained that in 2014 "it appeared that numerous applications were written in the same handwriting," but "there was not enough evidence of fraud at that time to warrant opening an investigation." She attested that the 2016 election occurred without incident, but in 2018 the Division "again observed the unusual circumstance of many absentee ballot applications in the same handwriting" from a single house district. This time, the case was referred to the Alaska State Troopers.

**D.    Proceedings On The Request For Injunctive Relief**

Twenty days after filing their complaint, the plaintiffs moved for a temporary restraining order asking the superior court to restrain the Division from mailing absentee ballots until the court had decided the pending motion for preliminary injunction; a temporary halt, they argued, would allow the ballots and accompanying instructions to be modified if necessary. The court denied the motion, reasoning that even if the witness requirement were eliminated, "it would not be reasonable to require the Division of Elections to modify the absentee ballot packets" so late in the process. In addition, the court reasoned, it could "grant different relief," such as requiring the

Division to communicate any changes by other means, including "appropriate websites, . . . television and radio, . . . [and] social media."

The superior court heard oral argument on October 1 and issued a written order on October 5, granting the plaintiffs' motion for preliminary injunction and denying the State's motion to dismiss. The court reasoned that the plaintiffs could not meet the balance of hardships standard for injunctive relief, but that they had made a clear showing of probable success on the merits and were therefore entitled to the requested injunction under that alternative standard. The court found that the State's asserted interests in maintaining the witness requirement during the pandemic — deterring fraud and promoting voter confidence in the election's integrity — were "not sufficiently compelling to justify burdening Plaintiffs' right to vote as safely as possible in the 2020 General Election." As for the State's laches argument, the court found that the plaintiffs "did not unreasonably delay in bringing their suit," reasoning that the science of the pandemic's reach and effects, and the government's response to it, were ever-changing — "the pandemic is a shifty beast" — and it was therefore not unreasonable for the plaintiffs to wait "until early September to file suit."

The State filed a petition for review. We heard oral argument on October 12 on an expedited basis and issued a summary order that same day affirming the superior court's grant of the preliminary injunction. We concluded "that the superior court did not abuse its discretion by granting the preliminary injunction" and said that a full opinion would follow. Today's opinion explains our reasoning.

## III.   STANDARD OF REVIEW

We recently explained the different standards of review that apply to our consideration of a superior court's decision to grant or deny preliminary injunctive relief: "A court's legal conclusions about irreparable harm, adequate protection, and the probability of success on the merits of a claim may present pure questions of law based

on undisputed facts or may involve mixed questions of fact and law."[7]  A fact issue may exist if, for example, there is a question about "whether a party faces irreparable harm unless an injunction is granted."[8]

The superior court in this case granted preliminary injunctive relief on grounds that (1) laches did not bar the plaintiffs' claim, and (2) the plaintiffs had demonstrated a probability of success on the merits of their constitutional claim.  The court's rejection of the laches defense implicates three different standards of review,[9] two of which are relevant here:  " '[W]hether the facts demonstrate an unreasonable delay and a resulting prejudice' . . . presents questions of fact we review for clear error."[10]  But "whether, based on the facts, it was appropriate to apply the laches doctrine . . . is a question reserved to the superior court's discretion, and we review it to determine whether that discretion has been abused."[11]  Whether the plaintiffs demonstrated a probability of success on their constitutional claim is subject to our de novo review, under which we "will 'adopt the rule of law that is most persuasive in light of precedent, reason, and policy.' "[12]

---

[7]     *State, Div. of Elections v. Galvin*, 491 P.3d 325, 332 (Alaska 2021).

[8]     *Id.*

[9]     *See Anderson v. State, Dep't of Admin., Div. of Motor Vehicles*, 440 P.3d 217, 219-20 (Alaska 2019).

[10]     *Id.* at 219 (quoting *Kollander v. Kollander*, 332 P.3d 897, 902 (Alaska 2014)).

[11]     *Id.* at 219-20.

[12]     *Sonneman v. State*, 969 P.2d 632, 636 (Alaska 1998) (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979)).

Finally, "once a party establishes the required elements for preliminary injunctive relief, the [superior] court exercises its discretionary authority" when deciding whether to grant or deny the requested relief; "thus, we review that decision for abuse of discretion."[13]

## IV.   DISCUSSION

### A.   Like The Superior Court, We Consider The Claim For A Preliminary Injunction Under The Probable Success On The Merits Standard.

We have recognized two different standards for determining whether a party should be granted a preliminary injunction; which standard applies depends on "the nature of the threatened injury."[14] The first standard is the "balance of hardships," which applies if "the plaintiff faces the danger of 'irreparable harm' and if the opposing party is adequately protected."[15] Under this standard, a "plaintiff 'must raise "serious" and substantial questions going to the merits of the case; that is, the issues raised cannot be "frivolous or obviously without merit." ' "[16] The second standard applies if "the plaintiff's threatened harm is less than irreparable or if the opposing party cannot be adequately protected"; in those circumstances "we demand of the plaintiff the heightened standard of a 'clear showing of probable success on the merits.' "[17]

The superior court considered both standards, concluding that while the plaintiffs could not meet the "balance of the hardships" standard, they did "[make] a clear

---

[13]   *Galvin*, 491 P.3d at 332.

[14]   *See State, Div. of Elections v. Metcalfe*, 110 P.3d 976, 978 (Alaska 2005).

[15]   *Id.* (quoting *State v. Kluti Kaah Native Vill. of Copper Ctr.*, 831 P.2d 1270, 1272 n.4 (Alaska 1992)).

[16]   *Id.* (quoting *Kluti Kaah*, 831 P.2d at 1273).

[17]   *Id.* (quoting *Kluti Kaah*, 831 P.2d at 1273).

showing of probable success on the merits" and were therefore entitled to the requested injunction. Considering first the balance of hardships standard, the court determined that the plaintiffs' claims were not "frivolous or obviously without merit." The court cited the plaintiffs' affidavits about the significant risks to health if the witness requirement was not lifted for the general election. But the court was unable to say that the elimination of the witness requirement would cause only "slight injury" to the State's interests; the court concluded, therefore, that the plaintiffs could not meet the balance of hardships standard for injunctive relief. We assume without deciding that the superior court's reasoning on this issue was correct, and we therefore proceed to consider the standard on which the superior court based its decision: probable success on the merits.

B. **The Superior Court Did Not Abuse Its Discretion By Granting A Preliminary Injunction Based On The Plaintiffs' Probability Of Success On The Merits.**

The superior court concluded that the plaintiffs would likely succeed on their first claim: that the witness requirement impermissibly burdened Alaskans' right to vote under article V, section 1 of the Alaska Constitution when viewed in the context of the pandemic and resulting risks inherent in person-to-person contact.[18] The court emphasized that the witness requirement placed a severe burden on the fundamental right to vote by "forc[ing] voters to choose between risking their health by coming into contact with a witness or forgo[ing] their right to vote entirely." The court concluded that the State's interests, though legitimate, "[were] not sufficiently compelling to justify burdening Plaintiffs' right to vote as safely as possible in the 2020 General Election."

---

[18] We note that the superior court decided the motion for preliminary injunction by reference to state law only, and the State did not argue in its petition for review that the court's enforcement of voting rights under the Alaska Constitution was limited by the United States Constitution or other federal law.

The State challenges the superior court's analysis on two grounds. First, it argues that the court relied on "speculation rather than requiring actual supporting evidence" and gave "short shrift to the Division's concerns about last-minute suspension of election laws" in its analysis of the State's interests. Second, the State argues that the plaintiffs were not clearly likely to succeed on the merits "because they sued too late and their claims [were] barred by laches."

### 1. It was not an abuse of discretion to reject the State's laches defense.

We address the laches argument first, concluding that the superior court did not abuse its discretion when it rejected laches as a defense to the plaintiffs' claims.[19] "The defense of laches requires that the defendant 'show two "independent" elements': '(1) that the plaintiff has unreasonably delayed in bringing the action, and (2) that this unreasonable delay has caused undue harm or prejudice to the defendant.' "[20]

The State argues that "[t]he plaintiffs were aware of the pandemic and the witness requirement" months before they brought suit, citing State and federal emergency declarations in March and Arctic Village's own imposition of restrictions "as early as March 13," with "its first lockdown on May 16." The superior court observed that "[w]ith 20/20 hindsight, Plaintiffs would have filed suit earlier." But the court decided that "20/20 hindsight is not required" and that the plaintiffs "did not unreasonably delay in bringing their suit." The court observed that "[t]he pandemic has not been a static or predictable experience in Alaska or elsewhere," that "COVID-19

---

[19]     *See Anderson v. State, Dep't of Admin., Div. of Motor Vehicles*, 440 P.3d 217, 219-20 (Alaska 2019) ("[W]hether, based on the facts, it was appropriate to apply the laches doctrine . . . is a question reserved to the superior court's discretion, and we review it to determine whether that discretion has been abused.").

[20]     *Id.* at 220-21 (quoting *City & Borough of Juneau v. Breck*, 706 P.2d 313, 315 (Alaska 1985)).

statistics have varied significantly since the Governor of Alaska declared a public health emergency on March 12," and that "[t]he number of COVID-19 cases and deaths rises and falls daily, not following any particular trajectory for any appreciable amount of time." The State does not challenge any of these findings of fact. The court also found that the delay did not cause undue prejudice to the State, as the court's order did not contemplate "modification or reprinting of the absentee ballot packages" but only further training of Division employees on how to handle unwitnessed ballots and "a carefully targeted public education plan," all of which could be accomplished in the time remaining.

The court's findings have substantial support in the evidence. And given those findings, we cannot conclude that it abused its discretion when it declined to apply the laches doctrine to bar the plaintiffs' claims.

> **2.      The superior court did not err by concluding that the witness requirement impermissibly burdened the right to vote in the context of the pandemic.**

In addressing the substance of the State's constitutional argument, we — like the superior court — use our established four-step analysis for assessing an election law's constitutionality under the Alaska Constitution. "We start with the bedrock principle that 'the right of the citizens to cast their ballots and thus participate in the selection of those who control their government is one of the fundamental prerogatives of citizenship.' "[21] The right to vote "encompasses the voter's right to express the voter's opinion and is a way to declare the voter's full membership in the

---

[21]      *Miller v. Treadwell*, 245 P.3d 867, 868 (Alaska 2010) (alterations omitted) (quoting *Carr v. Thomas*, 586 P.2d 622, 626 (Alaska 1978)); *see also Dansereau v. Ulmer*, 903 P.2d 555, 559 (Alaska 1995) (observing that the right to vote is "fundamental to our concept of democratic government").

political community."[22] Our four-part balancing test reflects the importance of this right, as well as the principle that "Alaska's constitution is more protective of rights and liberties than is the United States Constitution."[23]

> Our approach involves four steps. When an election law is challenged the court must first determine whether the claimant has in fact asserted a constitutionally protected right. If so we must then assess "the character and magnitude of the asserted injury to the rights." *O'Callaghan v. State*, 914 P.2d 1250, 1254 (1996) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). Next we weigh "the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* (quoting *Burdick*, 504 U.S. at 434). Finally, we judge the fit between the challenged legislation and the [S]tate's interests in order to determine "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* This is a flexible test: as the burden on constitutionally protected rights becomes more severe, the government interest must be more compelling and the fit between the challenged legislation and the [S]tate's interest must be closer.[24]

"[S]ubstantial burdens require compelling [State] interests narrowly tailored to minimally infringe on the right; modest or minimal burdens require only that the law is reasonable, non-discriminatory, and advances 'important regulatory interests.' "[25]

We address each factor of this test below.

---

[22]     *Id.* (alterations omitted) (quoting *Dansereau*, 903 P.2d at 559).

[23]     *State, Div. of Elections v. Green Party of Alaska*, 118 P.3d 1054, 1060 (Alaska 2005).

[24]     *Id.* at 1061 (footnotes integrated into text).

[25]     *State v. Alaska Democratic Party*, 426 P.3d 901, 909 (Alaska 2018) (quoting *O'Callaghan v. State*, 914 P.2d 1250, 1254 (1996)).

### a. The plaintiffs asserted a constitutionally protected right.

The superior court found that the plaintiffs "have asserted the constitutionally protected right to vote absentee." The State does not dispute that this is a constitutionally protected right; its position relies on the other three factors in our four-part test. For purposes of our analysis, therefore, we assume that the plaintiffs have asserted a constitutionally protected right under the Alaska Constitution.

### b. Enforcing the witness requirement during the COVID-19 pandemic would place a substantial burden on the right to vote.

Our next task is to determine the extent to which the witness requirement burdens the right to vote. The superior court reasoned that enforcing the witness requirement would "force Plaintiffs and other voters to choose between risking their health by coming into contact with a witness or forgo[ing] their right to vote entirely. This is a severe burden on Plaintiffs' fundamental right to vote."

The State asserts that the witness requirement imposes only a minimal burden, not significantly different from "any other day-to-day life activity" during the pandemic. It argues that the superior court relied on "speculation" rather than "actual supporting evidence" in deciding that the witness requirement would make voting unsafe for vulnerable people. And it provides a list of ways voters can "safely" vote absentee, including signing the ballot inside their home while a witness outside watches through a window, or signing the ballot "six, ten, or twenty" feet away from the observing witness.

But we agree with the superior court's conclusion, based on the plaintiffs' affidavits, that the burden the witness requirement imposes on voters during the pandemic is substantial. Clark and Jones, both elderly women with significant health issues, described the fear and anxiety they experienced when essential activities required them to leave their homes. Both women followed CDC guidelines strictly, self-isolating

since early 2020; they avoided in-person interactions as much as possible. Because they lived alone, they had no one close at hand to witness their absentee ballots. Both women, as committed voters, stated that if the witness requirement remained in effect it would force them to choose between their safety and exercising their right to vote.

Yatlin, the Arctic Village administrator, voiced similar concerns on a broader scale as she described the impact COVID-19 has had on her community. Yatlin explained that her village was under strict quarantine at the time of the proceedings in superior court. Yatlin noted that Native communities like Arctic Village are more vulnerable to COVID-19 and that Arctic Village has limited medical resources for caring for its population if the infection spreads, as those suffering severe symptoms would need to be medevaced to the nearest hospital 233 air miles away. According to Yatlin, "there is no way our people can fully participate in the upcoming general election with the current restrictions on mail in ballots in place."

This affidavit testimony supports the superior court's finding that the witness requirement would force some voters to choose between risking their health and exercising their right to vote, particularly voters who are especially vulnerable to contracting COVID-19 and especially likely to suffer severe effects. And we take judicial notice of public records supporting the reasonableness of the affiants' fears.[26]

---

[26] The plaintiffs cited information and directives from the CDC, the World Health Organization, and State and local officials in their complaint and their motion for preliminary injunction. The superior court did not expressly cite these sources in its decision, but it plainly assumed as true the basic facts about the COVID-19 pandemic's seriousness and the governmental response, as it was entitled to do under Alaska Evidence Rule 201(b). Over the past year numerous federal and state courts have taken judicial notice of information about the pandemic published by the CDC and other reputable sources. *See*, *e.g.*, *Nat'l Ass'n for Advancement of Colored People v. U.S. Postal Serv.*, 496 F. Supp. 3d 1, 6-7 & n.1 (D.D.C. 2020) (taking judicial notice of COVID-related "documents and information on official government websites" and
(continued...)

According to the Alaska Department of Health and Social Services, Alaska had 2,681 reported cases of COVID-19 and 16 related deaths in September 2020; 7,695 cases and 45 deaths in October 2020; and 16,495 cases and 90 deaths in November 2020.[27] From the beginning of the pandemic until September 12, 2021, Alaska experienced 90,946

---

[26] (...continued)
"certain information at the World Health Organization website, the Johns Hopkins University website, and the Mayo Clinic website which is 'not subject to reasonable dispute' because they are 'sources whose accuracy cannot be reasonably questioned' " (quoting Fed. R. Evid. 201(b)(2))); *Basank v. Decker*, 449 F. Supp. 3d 205, 211 (S.D.N.Y. 2020) ("The Court takes judicial notice that, for people of advanced age, with underlying health problems, or both, COVID-19 causes severe medical conditions and has increased lethality."); *United States v. Bryant*, 500 F. Supp. 3d 1172, 1173 n.1 (E.D.Wash. 2020) ("The Court takes judicial notice of the Center[s] [for] Disease Control and Prevention's . . . website regarding Covid-19."); *United States v. Greenlight Organic, Inc.*, 503 F. Supp. 3d 1269, 1273 (Ct. Int'l Trade 2021) ("The court takes judicial notice that travel and remaining indoors for extended periods of time with other people during the COVID-19 pandemic poses personal health risks."); *Cty. of Los Angeles Dep't of Pub. Health v. Superior Court of Los Angeles*, 275 Cal. Rptr. 3d 752, 765 n.8 (Cal. App. 2021) ("[W]e take judicial notice of the CDC and the County of Los Angeles Public Health websites tracking the numbers of COVID-19 deaths."); *Grisham v. Romero*, 483 P.3d 545, 550 (N.M. 2021) ("[W]e take judicial notice of (1) the serious health risks posed by COVID-19, a 'highly contagious and potentially fatal' disease, (2) the disease's transmission within New Mexico, and (3) the emergency orders issued by [state officials]." (quoting *Legacy Church, Inc. v. Kunkel*, 472 F. Supp. 3d 926, 978 (D.N.M. 2020), *aff'd sub nom. Legacy Church, Inc. v. Collins*, 853 F. App'x 316 (10th Cir. 2021))).

[27] *AK COVID-19 Cases Dashboard, Monthly Case Count*, ALASKA DEP'T OF HEALTH & SOC. SERVS., https://experience.arcgis.com/experience/2d19dc2b5c7e4b399ff6495a8950493d/ (last updated Sept. 12, 2021). The number of Alaska deaths as reported by the Centers for Disease Control is lower:  12 deaths in September, 33 in October, and 69 in November. *Daily Updates of Totals by Week and State*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/nchs/nvss/vsrr/covid19/index.htm (last updated July 13, 2021).

cases of COVID-19, 444 related deaths, and 2,128 hospitalizations.[28]  The persons most at risk of contracting the virus — and the persons most at risk of becoming seriously ill if they do contract it — include those over 65, those with preexisting conditions including pulmonary disease and obesity, and members of certain racial and ethnic groups that have historically had poorer access to health care.[29]  The mechanism of contagion is not fully understood, but generally speaking "COVID-19 spreads when an infected person breathes out droplets and very small particles that contain the virus," which are then "breathed in by other people or land on their eyes, noses, or mouth" and "[i]n some circumstances . . . may contaminate surfaces they touch."[30]  "People who are closer than 6 feet from the infected person are most likely to get infected."[31]

The State points out that the individual plaintiffs voted absentee in the August primary and could do so again; however, a willingness to accept a risk once does not mean that the risk is less daunting the second time around, especially in the context of a steady increase in case counts, infection rates, and deaths.  And although the State proposes methods by which relatively safe signature-witnessing could occur — through a closed window, or from some distance away, with appropriate sanitization and masking — even these attenuated encounters have risks that persons of heightened susceptibility may be anxious to avoid.  Like the superior court, we therefore conclude

---

[28]     ALASKA DEP'T OF HEALTH & SOC. SERVS., *supra* note 27.

[29]     *Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated Aug. 20, 2021).

[30]     *How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last updated July 13, 2021).

[31]     *Id.*

that the witness requirement placed a substantial burden on the right to vote during the 2020 general election.

> ### c. The State's asserted interests are compelling at least in the abstract.

Having concluded that the witness requirement imposes a substantial burden in the context of the COVID-19 pandemic, we must decide whether the State's justifications for the requirement reflect "compelling interests narrowly tailored to minimally infringe on that right."[32] We have held that "[i]n evaluating interests underlying state election laws 'a particularized showing' is not required."[33] However, "while the [S]tate may anticipate likely problems in the electoral process, it cannot justify imposing significant constitutional burdens merely by asserting interests that are compelling only in the abstract."[34] Instead, "the [S]tate must explain why the interests it claims are concretely at issue and how the challenged legislation advances those interests."[35] We note that "in reviewing the adequacy of the [S]tate's explanation, a court must ask not 'in the abstract . . . whether fairness, privacy, etc., are highly significant values[ ] but rather . . . whether the aspect of fairness, privacy, etc., addressed by the law at issue is highly significant.' "[36]

---

[32] *State v. Alaska Democratic Party*, 426 P.3d 901, 909 (Alaska 2018).

[33] *State, Div. of Elections v. Green Party of Alaska*, 118 P.3d 1054, 1065 (Alaska 2005) (alteration in original) (quoting *O'Callaghan v. State*, 914 P.2d 1250, 1254 (Alaska 1996)).

[34] *Id.* at 1066.

[35] *Id.*

[36] *Id.* (second through fourth alterations in original) (emphasis omitted) (quoting *Cal. Democratic Party v. Jones*, 530 U.S. 567, 584 (2000)).

The State relies on several justifications for maintaining the witness requirement during the pandemic, the first of which is "deterring voter fraud." Although the State concedes that "[f]raud related to absentee ballots is rare," it argues that "[t]he absentee ballot witness requirement helps deter fraud by adding a verification that the person who filled out the ballot sealed it in the envelope and signed it." As another important interest at stake, the State cites "the Division's interest in not changing an elections requirement at this very late date," as last-minute changes "could create confusion and distrust in the Division and the election result."

These interests are legitimate and compelling at least "in the abstract";[37] the legislature is allowed to address them by anticipating election-related problems "with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights."[38] But to justify the burden on constitutionally protected rights, the witness requirement must actually "advance those interests"[39] and must do so in a narrowly tailored way. This brings us to the fourth element of our test for assessing an election law's constitutionality.

### d. The fit between the State's interests and the witness requirement is not close enough to justify the substantial burden on the right to vote.

The final step in our analysis is judging "the fit between the challenged legislation and the [S]tate's interests in order to determine 'the extent to which those

---

[37] *See id.*

[38] *State, Div. of Elections v. Metcalfe*, 110 P.3d 976, 981 (Alaska 2005) (quoting *O'Callaghan*, 914 P.2d at 1254).

[39] *Green Party*, 118 P.3d at 1066.

interests make it necessary to burden the plaintiff's rights.' "[40]  That is, is the witness requirement effective enough at deterring fraud and boosting voter confidence in Alaska's election process that its use is justified despite the substantial burden it places on the right to vote during the pandemic?

In support of its fraud deterrence rationale, the State cites the recent indictment of a former state legislator and two associates "on multiple counts of voter fraud after the Division detected irregularities in absentee ballot applications" in the 2018 general election.  A witness requirement, however, had no apparent part in the detection of that alleged fraud, as ballot applications, which may be completed online, are not required to be witnessed.[41]  Nor has the State identified any more relevant examples.  As described in the superior court's preliminary injunction order, it asked the State's counsel at oral argument "whether the Witness Requirement had ever played a role in detecting fraud," but the attorney "could not identify any such instance in recent memory, and was not sure whether it had played a role in detection in the more distant past."  The superior court concluded that, "[b]ased on the record before it," it could not find that the witness requirement was "an effective tool for detecting voter fraud," and we must agree.

As for the State's interest in promoting voter confidence, the superior court agreed with the State's argument that the witness requirement could "lend an air of formality to the absentee voting process"; the court observed, however, that there are "other aspects of Alaska's election laws [that] ensure the integrity of absentee voting." The court took note of "the fact that voters are required to provide identification and sign absentee ballots under penalty of perjury, which carries a criminal penalty of up to ten

---

[40]     *Id.* (quoting *O'Callaghan*, 914 P.2d at 1254).

[41]     *See* STATE OF ALASKA DIV. OF ELECTIONS, ONLINE ABSENTEE BALLOT APPLICATION, https://absenteeballotapplication.alaska.gov/ (last visited Sept. 13, 2021).

years of incarceration."[42] The court also suggested that eliminating the witness requirement "for this election only, . . . to protect individuals' rights to protect their health *and* to vote," could actually "*increase* voter confidence in Alaska's elections system, showing that even during a pandemic, the [S]tate will maximize our citizens' opportunities to vote safely." (First emphasis in original, second emphasis added.) We acknowledge that the effect of the witness requirement on the public's confidence in the absentee voting process is not readily susceptible to proof. However, given the lack of evidence that the requirement is effective in detecting fraud — and the other protections in place (such as signing under penalty of perjury) to guard the integrity of the process — we conclude that the witness requirement is not closely enough related to the State's interest in promoting public confidence in elections to justify the burden it places on voters in the context of the COVID-19 pandemic.

The State points out that other states were implementing or enforcing witness requirements in the face of last year's challenges, noting that at the time this petition was before us there were "only two adversarial cases in which trial courts [had] enjoined a state's witness requirement due to the pandemic" and that higher court rulings had cast doubt on those decisions. But in two cases in which a witness requirement was suspended pursuant to a consent decree, the reviewing courts independently reviewed the merits and concluded that witness requirements were likely unconstitutional in the

---

[42] The sample absentee ballot submitted to the superior court as an exhibit to Director Fenumiai's affidavit shows that the voter is required to certify, under penalty of perjury, that the voter is "a citizen of the United States," has "been a resident of Alaska for at least 30 days," has "not requested a ballot from any other state," and is "not voting in any other manner in this election."

midst of the COVID-19 pandemic.[43]  And it bears repeating that Alaska's constitution is particularly "protective of rights and liberties."[44]

In sum, the witness requirement imposed a substantial constitutional burden in the unique context of the COVID-19 pandemic.  Although the State's countervailing interests are compelling "in the abstract,"[45] the witness requirement was not shown to effectively advance the State's interest in deterring fraud and is not narrowly tailored to advance the interest in promoting confidence in the election.  The State's asserted interests therefore did not justify the burden on the rights of absentee voters guaranteed by article V, section 1 of the Alaska Constitution.  Because we agree that the plaintiffs were likely to prevail on this constitutional issue, we conclude that the superior court did not abuse its discretion by granting the preliminary injunction.

## V.     CONCLUSION

We AFFIRM the superior court's order granting the preliminary injunction.

---

[43]     *See Common Cause R.I. v. Gorbea*, No. 1:20-CV-00318-MSM-LDA, 2020 WL 4365608, at *4-5 (D.R.I, July 30, 2020) (approving consent decree "suspend[ing] the witness and notary requirements for the remaining 2020 elections"); *League of Women Voters of Va. v. Va. State Bd. of Elections*, 481 F. Supp. 3d 580, 585-88 (W.D. Va. 2020) (approving consent decree suspending Virginia's witness requirement for absentee voters who "believe they may not safely have a witness present while completing their ballot").

[44]     *Green Party*, 118 P.3d at 1066.

[45]     *Id.* at 1060 (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 194 (1986)).